Brenda GATLIN, Serena Smith, and Mary A.T. Anigbo, Appellants,

v.

UNITED STATES, Appellee.

No. 97–CF–1811, 97–CF–1847, 97–CF–1929.

District of Columbia Court of Appeals.

Argued March 7, 2002.

Decided Oct. 16, 2003.

Marvin E. Clemons, appointed by the court, filed a brief for appellant Brenda Gatlin.

Linda Sroufe, Washington, DC, appointed by the court, for appellant Serena Smith.

Veronice Holt, Washington, DC, appointed by the court, for appellant Mary A.T. Anigbo.

Patricia A. Heffernan, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Thomas J. Tourish, and Kenneth C. Kohl, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB, REID and GLICKMAN, Associate Judges.

REID, Associate Judge:

Appellants Brenda Gatlin, Serena Smith, and Mary A.T. Anigbo, employees of a District of Columbia charter school at the time of their arrests, appeal their convictions on various charges growing out of confrontations and altercations with a newspaper reporter, a photographer, and two police officers, on the premises of the school.[1] They were charged in a six-count indictment. In count one, Ms. Gatlin, Dr. Anigbo and Ms. Smith were accused of assaulting the reporter, in violation of D.C.Code § 22–504 (1996); Ms. Smith was

---

1. We originally consolidated with these appeals that of Mr. Barrington H. Smith (No. 97–CF–1850), another employee who was arrested and convicted of a single count of assaulting a police officer. His appeal has now been severed from these and we have remanded his case to the trial court for further proceedings.

acquitted of this charge and both Ms. Gatlin and Dr. Anigbo were found guilty.[2] Count two specified that Ms. Gatlin and Dr. Anigbo took property ("a notepad") belonging to the reporter without right, in violation of § 22–3816; they were found guilty. Ms. Gatlin was adjudged guilty of count three, assault on the photographer, in violation of § 22–504. Ms. Smith was acquitted of count four, taking property without right belonging to the photographer. Dr. Anigbo and Ms. Smith were found guilty of assaults on two police officers, in violation of § 22–504.[3]

On appeal, the appellants raise challenges primarily claiming that the trial court (1) erred in denying their motions to suppress; (2) improperly denied Dr. Anigbo's and Ms. Gatlin's defense of property defense; and (3) made clearly erroneous factual findings regarding some of the charges. We conclude that the trial court did not err in denying their motions to suppress, because appellants did not have standing to challenge the validity of the search and seizure by law enforcement officers. We affirm the convictions of Dr. Anigbo and Ms. Smith for the assaults of two police officers inside the school's main office or its doorway, as well as the conviction of Ms. Gatlin for the assault of the newspaper photographer. In doing so, we hold that these appellants were not entitled to the defense of property defense where the police officers were engaged in the investigation of complaints about alleged criminal conduct, and where the appellants could have requested the assistance of the police in ejecting any person

who unlawfully was on the school premises. Furthermore, we affirm the convictions of Dr. Anigbo and Ms. Gatlin on charges of taking property without right, because the trial court's finding that the notebook belonged to the newspaper reporter was not clearly erroneous. Finally, we affirm the convictions of Dr. Anigbo and Ms. Gatlin for the assault on the newspaper reporter, because even if, arguably, the defense of property defense was available to them during the newspaper reporter's first entry into the school on the day in question, the amount of force they used was unreasonable.

## FACTUAL SUMMARY

The evidence in this case showed that on December 3, 1996, at approximately four o'clock in the afternoon, Ken McIntyre, Metro Editor at the Washington Times, called 911. After identifying himself, he stated: "One of our reporters has been attacked and beaten at a school. We would like you to go out there and meet her there." He reported that the school was "Langley Junior High" and that the reporter, who was "very shaken up," would meet the police at North Capitol and Seaton Streets. He added:

> Listen, this is a reporter of mine—my education reporter.... She's very shaken up. She's been ... kicked, hit and thrown out of the building. She was on an assignment for this newspaper. And among those manhandling her w[ ]ere the principal of this school, whose name

2. All of the appellants were tried without a jury. The actual trial spanned a two-week period.

3. Imposition of sentence was suspended in the case of all three appellants. Ms. Gatlin and Ms. Smith were ordered to serve one year of supervised probation, concurrently, with respect to each count on which they were

convicted, and also to perform 120 hours of community service (no less than ten hours per month). Dr. Anigbo was ordered to serve 24 months of supervised probation, concurrently, with regard to each count on which she was convicted, and to perform 240 hours of community service (no less than 10 hours per month).

is Mary Anigbo.... I'm serious. I'm deadly serious about this. She's really upset. And she ... Oh, they stole her notebook, okay? We want that notebook back. It's our property, and it was pulled physically out of her hands as she pleaded to get it back and they held on to it in the principal's office. And that's the first intent to get you out there to join them. We want that notebook back.

When the 911 operator inquired as to whether the reporter would need an ambulance, Mr. McIntyre responded, "Ah, no she doesn't need an ambulance." He also emphasized: "[S]he's pretty shaken up. I don't think she wants to go back there without police escort." Mr. McIntyre identified the reporter as Susan Ferrechio.

After learning that a Washington Times reporter had been assaulted at a school, the Director of Photography at the newspaper sent Clifford Owen, a photographer, to "make sure" that Ms. Ferrechio was "okay." Mr. Owen was instructed "to document any injuries [Ms. Ferrechio] has and what happen[ed]." He met Ms. Ferrechio at North Capitol and Seaton Streets "a few minutes after four o'clock." She was talking on the telephone and "was shaking." About 15 to 20 minutes after Mr. Owen encountered Ms. Ferrechio, Barrington Salmon, a metro reporter for the Washington Times, appeared on the scene and spoke with Ms. Ferrechio. Mr. Salmon thought Ms. Ferrechio "seemed

upset ...[,] looked nervous, [and] was crying a little."

Officer Poe arrived at the corner of North Capitol and Seaton around 4:35 p.m. He spoke with Ms. Ferrechio whom he described as "very upset." He then drove to the Langley Junior High School,[4] accompanied by Ms. Ferrechio, in his marked police cruiser. Mr. Salmon and Mr. Owen followed the police cruiser to the school in their personal automobiles. They arrived at the school around 4:40 p.m. The group stood outside the school for five or six minutes. Mr. Owen had two cameras with him and began to take pictures. Officer Best, responding to a police radio directive, soon arrived on the scene in his marked police cruiser. After the two officers conferred, Officer Best "led the way" into the school through the front door. Although Dr. Anigbo, the principal of the school, testified that her practice was "[t]o keep the [school] door locked, to admit a visitor only if the visitor rang the bell, and to make sure an adult admitted any such visitor, Mr. Owen observed that the center door "was unlocked and ... open a couple of inches."[5] The officers entered the foyer and proceeded to the main office, followed by Mr. Owen, Ms. Ferrechio, and Mr. Salmon. The area in the main office where everyone congregated was relatively small.

As he approached the counter in the main office, "Officer Best asked who was the principal," and Dr. Anigbo replied: "I'm the principal but I'm mad, [I] don't want to talk to you."[6] While Officer Best

---

**4.** The Marcus Garvey School occupied premises formerly known as the Langley Junior High School. Apparently there were no signs on the outside identifying the school by its new name, and the police officers did not realize, at first, that they were being dispatched to the Garvey school.

**5.** Dr. Anigbo testified that Mr. Smith alerted her to the presence of the police and Ms. Ferrechio outside of the school. She instruct-

ed him to "go back and check that [front] door and make absolutely sure that it's locked."

**6.** Dr. Anigbo portrayed Officer Best as "very, very confrontational, very abrasive and hostile." She informed him, "I'm the principal, but I don't think I want to talk to you, I just want you to get out of here."

engaged Dr. Anigbo in conversation, Mr. Owen concentrated on getting pictures of those who reportedly attacked Ms. Ferrechio. He informed Ms. Ferrechio that his instructions from the Washington Times were to get pictures of those who assaulted her, and that "it's real important" that he do so. He asked if she "could identify anybody who had assaulted her" at the school. Ms. Ferrechio expressed concern about getting her notebook back but eventually identified the person who assaulted her as "the secretary and she has short hair." Upon seeing someone who fit the description, Mr. Owen said "very loud[ly]," "Is this the woman who assaulted you? I need to get her picture." Mr. Owen quickly took three pictures of the woman with short hair, later identified as Ms. Gatlin.

The picture-taking sparked a reaction from the school staff. Officer Best testified that as Dr. Anigbo finished speaking, "a flash went off, the principal and staff jumped up and went towards the door where the flash had come from." Officer Poe asserted that when "the photographer and reporter entered the office ... the principal and staff went berserk." And, Mr. Salmon noted that "[t]he reaction [of the school's personnel to Mr. Owen taking pictures] was very intense.[7] They were angry, they were shouting and trying to get hold of the camera." Both officers saw Ms. Gatlin, Ms. Smith and Dr. Anigbo move towards the photographer and reporter. The three women were "screaming ... [and] running towards the photographer and the reporter. Ms. Gatlin ... had the lead." "[T]he staff started

screaming stop taking pictures, you shouldn't be in here...." Officer Poe saw "Ms. Gatlin [s]winging at [Ms.] Ferrechio and [Mr.] Owen." Mr. Salmon observed Ms. Gatlin as she "hit [Mr. Owen] in the chest. And Officer Best said Ms. Gatlin, Ms. Smith and Dr. Anigbo "were pushing and shoving in an attempt to get the photographer." He saw Ms. Smith "sw[i]ng and hit Officer Poe in the head."[8] Mr. Owen testified that two women [Ms. Gatlin and Ms. Smith] "were [coming] at [him] ..." Mr. Owen "was being pushed and shoved and hit by people[, but he] couldn't see who they were...." However, Ms. Gatlin "reached over the police officers and punched [Mr. Owen]" in the shoulder area with her "fist." Mr. Salmon noticed Ms. Smith striking an officer "[i]n the upper body."

The officers were standing between the school staff and the Washington Times personnel. The women continued to push and shove the officers back toward the door of the principal's office. Officer Best asserted that Dr. Anigbo pushed and shoved him in his "chest and shoulder area," and that Ms. Smith also pushed him in the "[c]hest and shoulder area." Officer Best saw Dr. Anigbo push Officer Poe "[w]ith enough strength to get him out of the office into the hallway."[9] Mr. Salmon stated that Dr. Anigbo struggled with Officer Poe and "pushed and pulled" him.

According to the testimony of Officer Poe, Mr. Gatlin, Ms. Gatlin's brother, was able to get staff back into the main office

7. Dr. Anigbo acknowledged that she and Ms. Smith loudly objected to the taking of pictures, primarily because of the presence of children in the school.

8. Dr. Anigbo claimed that Officer Best "slapped" Ms. Smith. Later, she corrected herself to assert that it was Officer Poe, not Officer Best, who struck Ms. Smith. She

heard Mr. Gatlin ask Officer Poe, "why [did] you slap that woman like that?"

9. Dr. Anigbo depicted Officer Poe as "out of control" and said she was trying to "talk him down." She had had a previous encounter with him and referred to him as "a mean-spirited bully" who had a "look of rage on his face" and who "wanted to slap her."

and hold them there. Officer Poe and Dr. Anigbo remained in the hallway. Dr. Anigbo placed her hands on Officer Poe's arms, and Officer Poe thought that "[s]he had a good grasp of [him] ... [and was] really tugging onto [his] jacket." [10] But Dr. Anigbo insisted that she held on to Officer Poe because she was trying "to talk [him] down ...[,] to talk some sense into his head." She said to the officer: "brother, brother, listen to me, listen to me, hold still, will you listen to me, please listen to me, are you going to kill somebody over a camera?" She believed that Officer Poe was "determined to get back into that office."

At some point, Officer Best used his police radio to request assistance from other police units.[11] MPD Officer David Taylor heard a radio distress call from Officer Best while he and his partner were en route to the school as a result of Officer Poe's earlier call for assistance. He arrived at the school at 4:57 p.m. in an unmarked police car," and saw "numerous officers on the scene." They included Sergeants Washington and Dixon, and Officer Rorie. Officer Taylor was met by Officers Best and Poe in the foyer of the school. Officer Taylor portrayed Officer Best as "a little perturbed."

Officer Taylor "proceeded to the [main] office door [where] he was met by [Ms.] Gatlin and [Ms.] Smith." He identified himself and his partner, Detective Braxton, and requested that they be allowed to enter the office.[12] They were admitted, and Officer Taylor asked Dr. Anigbo whether she was the principal. She responded, "If I am, who wants to know?" Officer Taylor identified himself and Detective Braxton. Dr. Anigbo informed them that she did not wish to speak with them, and "had already called the captain." She had instructed Ms. Gatlin to call the Fifth District police precinct and to ask for "a white shirt" or someone in authority to come to the school immediately." "[Dr.] Anigbo started making comments to [Officer Taylor]," stating "that the reporter had no right to be in her school, that the reporter had come in and was interviewing the children as well as was writing things in her notebook." Officer Taylor further described what Dr. Anigbo said to him:

> She [the reporter] wrote across the top of the page Marcus Garvey; then she had Bob Marley; then she had at the black last supper. Then she wrote the initials of C.J. And C.J. was the initials of the student I believe that [the reporter] had interviewed.....[T]he reporter had no right to the information.

Officer Taylor remarked: "Okay, ma'am ... okay. Then the notebook was taken." Dr. Anigbo responded: "It's in here somewhere," and Officer Taylor asked, "Where is it?" Dr. Anigbo replied: "It was on the floor, I don't know." In response to Officer Taylor's request that she "go get" the notebook, Dr. Anigbo maintained that she did not know where it was. Officer Taylor advised Dr. Anigbo:"Well, ma'am, regardless of what someone had written in their notebook, you had no right to take that

---

10. Officer Best advised Mr. Owen that: "It might be a good idea if you stop taking pictures." Officer Poe also "suggested that [Mr. Owen] leave the school." Nevertheless, Mr. Owen remained in the school building because he did not know where Ms. Ferrechio was and would not leave without her.

11. One of the officers who responded was Michael Rorie. When he "first walked [into the school, people] were upset, they [were] yelling and screaming." He did not ascertain any details concerning what had occurred. Rather, he "called for an official to come on the scene."

12. Detective Braxton took information from Mr. Owen relating to his claim that Ms. Gatlin punched him.

from anybody." Dr. Anigbo maintained that the reporter "had no right to that information."

Captain Bolling W. Smith responded to the call for the "watch commander."[13] He arrived at the school around 5:10 p.m. and found a "very volatile" situation. "Several of the civilians were yelling and screaming, [and there was] a good deal of anger and emotion." He identified Ms. Gatlin, Dr. Anigbo, and Ms. Smith as those who were angry, screaming and yelling. He spoke with Dr. Anigbo and attempted "to get her to calm down enough so that [he] could attempt to find out what was going on." Dr. Anigbo said that:

> [A] white reporter had come into her school and had taken notes and that [she] had read the notes on the reporter's notebook and that she did not like the things that the reporter had written and that the reporter was not friendly to the school and therefore the reporter's notebook had been taken away from her.

Dr. Anigbo "didn't address [the] issue [concerning who owned the notebook] specifically, she referred to it as the reporter's notebook." She gave the note pad to Mr. Gatlin and told him to put it in the trash.[14] The note pad was never found despite a search by the police on December 3, 1996.

Ms. Ferrechio testified that she first entered the Garvey School on December 3, 1996, around 3 p.m., "maybe a little after 3:00," through the middle door which "was slightly ajar by several inches." She went to the main office, whose door was open, and spoke with Ms. Gatlin, the office manager. She stated that she was with the Washington Times and wanted to interview Dr. Anigbo for a story on charter schools. Ms. Gatlin indicated that Dr. Anigbo was in class, and suggested that a student (whom Ms. Ferrechio initially thought was a maintenance worker because he was wheeling a dolly and had on "camouflage fatigues") take Ms. Ferrechio to find Dr. Anigbo. Ms. Ferrechio began to ask the student questions as they walked. Soon, Ms. Gatlin caught up with her and informed her that Dr. Anigbo was on the way to the office and that Ms. Ferrechio should meet her there.

While she was waiting in the main office for Dr. Anigbo, Ms. Ferrechio continued to talk with the student, identified as "C.J.," until Ms. Gatlin told her to "stop talking to the students, [because] you're not supposed to talk to the students...." Ms. Gatlin asked to see what Ms. Ferrechio had written in the notebook, but Ms. Ferrechio refused the request. Eventually Dr. Anigbo returned to the office.

Dr. Anigbo and Ms. Ferrechio gave different accounts about what transpired when they saw each other in the main office. Ms. Ferrechio asserted that when she greeted the principal, Dr. Anigbo "immediately started yelling ... and saying, ... what's in that notebook? What are you writing in that notebook? What are you doing in this school .... I want that notebook." As Ms. Ferrechio was explaining why she was at the school, Dr. Anigbo continued to demand the notebook, which Ms. Ferrechio refused to give up, pointing out why she could not turn the notebook

---

**13.** Captain Smith explained that "[t]he watch commander exercises operational control over the [police] district during the tour of duty."

**14.** According to Dr. Anigbo, she told Captain Smith that the notebook "was in the trash as far as [she] knew," and although she had "many, many yellow pads" in her office, after the police searched it, "not a single yellow pad [could] be found when [the police] left." She also asserted that she took the police to the place where trash was kept, but later concluded that the officers never touched the trash bags.

over to Dr. Anigbo. Then, "the people who were in the office ... started to ... approach [her] and ... [Dr. Anigbo] and they kind of formed a circle around me." In response to the prosecutor's question whether Ms. Ferrechio "consider[ed] leaving at that point," she replied, "yes." She added, "I finally decided that for some reason she's not understanding me and this is not working out. I think I should just leave."

During her earlier grand jury testimony, Ms. Ferrechio described what happened immediately after Dr. Anigbo returned to the main office and demanded the notebook:

> We were all in the office. At that point, a lot of people were surrounding me, a lot of people, so I was on either side, and [Dr. Anigbo] was standing ... in the doorway a little bit, so she's blocking the door with some folks on either side of her, and then the people who had been milling around the office had joined in and gathered around me.
>
> And [Dr. Anigbo] was saying I had no right to be in her school, who did I think I was, and her voice level was so loud and she was so confrontational, up close to me, that I realized that I just wasn't going to win her over .... She was yelling really loud and I was scared because I've never been yelled at, literally, I don't think at least in a long, long time since I was a small child by an adult like that, just yelling. And I was just like, Whoa. Then finally I said, All right. I think I just better leave ....

A struggle over the notebook took place during which Ms. Ferrechio was kicked, pulled, shoved, hit, shaken, and ejected from the school.

At trial, Ms. Ferrechio depicted what happened after those in the office formed a circle around her. However, she did not mention, as she did in her grand jury testimony, that Dr. Anigbo "was saying I had no right to be in her school ...."

> [Dr. Anigbo] continued to demand the notebook. I continued to hold on to it and say she couldn't have it and finally she just lunged .... She wanted the notebook, she lunged at me, swung her arm over her head and grabbed the notebook .... She said give me the [expletive deleted] notebook .... She started to pull on it, and I held on to it and we had a tug of war with the notebook ....

As Ms. Ferrechio and Dr. Anigbo were tugging and pulling at the notebook, Ms. Gatlin and Ms. Smith, were "[g]rabbing [Ms. Ferrechio's] arms and shaking [her] and [Ms. Gatlin] was punching [her] ... in the right arm ... with her fist." After an unidentified person pulled Ms. Ferrechio's hair from the back, she "loosened [her] grip on the notebook ... and [Dr. Anigbo] succeeded in getting it out of [her] hand and ... threw it across the room." When Ms. Ferrechio sought to retrieve the notebook, Dr. Anigbo "told her to get ... out of the school[,] ... [and] punched [Ms. Ferrechio] in [her] right arm ... and then grabbed [Ms. Ferrechio's] arm and began to yank [her] and push [her] out of the office." Ms. Ferrechio was "shov[ed] out of the school ..." by Ms. Smith, Ms. Gatlin, Dr. Anigbo, "and several students." Ms. Ferrechio "was picked up by the back of [her] arms or lifted off the ground and somebody opened the door and [she] was thrown out of the school onto the outside of the front walk." She was unable to identify those who lifted her and threw her out of the school. Dr. Anigbo was standing next to Ms. Ferrechio as she was being removed from the school, and said: "[Y]ou get out of here, you better get out of here, I cannot guarantee your safety. You're going to get hurt if you don't get out of here." After being thrown out of the

school, Ms. Ferrechio walked away and was followed by two teenagers who were "yelling things to [her] and threatening [her]. Ms. Ferrechio found a telephone and called her newspaper.

Dr. Anigbo's account of the earlier incident differed. When she saw Ms. Ferrechio, she said to her: "[W]hat are you doing here? I have no appointment with you. Why are you interviewing my students? Get out, I want you out." Ms. Ferrechio responded: "[H]ey, wait a minute, I just came to get a story, I'm the lady who did the . . . story for you before." Dr. Anigbo "told [Ms. Ferrechio] to give [her her] note pad which Ms. Ferrechio had just picked up from the counter beside her and get out of my school."[15] Ms. Ferrechio "literally push[ed Dr. Anigbo] in the chest." Dr. Anigbo informed Ms. Ferrechio that "you're not going out of here with my note pad, give me back my note pad. [Dr. Anigbo] reached for the note pad and snatched it out of [Ms. Ferrechio's] hand." A student instructed Ms. Ferrechio to "get your hands off [Dr.] Anigbo." The student "then took [Ms.] Ferrechio . . . by the pads of her coat and marched her out of the office . . . ., through the foyer and out the door."

## ANALYSIS

*The Motion to Suppress*

 The appellants challenge the trial court's denial of their suppression motions. Prior to trial, they filed motions to suppress tangible and intangible evidence, including their identification, photographs taken within the school by Mr. Owen, and testimony pertaining to the warrantless search of the school premises. After a hearing on the motions which lasted ap-

proximately four days and during which testimony was presented by the prosecution and the defense, the trial judge posed the following questions and answered them in the negative:

> Was the police entry into the school on the 3rd of December violative of the Fourth Amendment? Do the defendants have standing to challenge the legality of that entry? Were the defendants illegally seized in violation of the Fourth Amendment? And were their statements that were the product of custodial interrogation obtained in violation of Miranda requirements?

On appeal, the appellants contend that the trial court erred in denying their suppression motions. They maintain that "business premises are protected against intrusions by law enforcement officers by the Fourth Amendment [to the Constitution]," and as lessee of the premises housing the Marcus Garvey Charter School and principal of the school, Dr. Anigbo had the right to exclude persons from the school. They assert that "[the trial court's] fact-finding with respect to [their] reasonable expectations of privacy was clearly erroneous," and that "[the trial court] ignored the uncontested and uncontestable evidence that the school was private property." They emphasize their right to "workplace privacy." The government primarily argues that:

> [E]ven if this [c]ourt determined (contrary to the trial court) that police violated the Fourth Amendment when they entered the school, and that appellants had standing to complain about that violation, the unchallenged ruling that there is no fruit from the violation stands, and there is therefore no relief available to appellants.

15. Dr. Anigbo was certain the note pad was hers because "it had on the back of it [her] scribblings . . . [and her habit was to] scribble down the side of the pages [in the note pad], [] put her name or [] draw . . . symbols or something along the side of the pad."

■ Our review of a motion to suppress is "limited." *Davis v. United States,* 781 A.2d 729, 734 (D.C.2001) (citing *Flores v. United States,* 769 A.2d 126, 129 (D.C. 2000)). "We view the evidence in the light most favorable to the prevailing party, and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling." *Id.* (citations and internal quotation marks omitted). We "defer to the trial court's findings of fact, [but] we review its conclusions of law *de novo.*" *Id.*

■ The initial question we confront in this case is whether the appellants have standing to challenge the validity of the search and seizure by law enforcement officers. "[B]efore we may consider whether the police violated the Fourth Amendment by entering [the premises] . . . without a warrant, we must determine whether [the appellants] had a legitimate expectation of privacy in [the invaded place]." *Brown v. United States,* 627 A.2d 499, 502 (1993); *see also Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). In addition to a home, an "invaded place" may be a business or other workplace. As the Supreme Court said in *O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987), "It has long been settled that one has standing to object to a search of [one's] office, as well as of [one's] home." *Id.* at 722, 107 S.Ct. 1492 (quoting *Mancusi v. DeForte,* 392 U.S. 364, 369, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968)). It is not sufficient, however, to show merely a subjective expectation of privacy because "a person's 'subjective expectation of privacy is [only] legitimate if it is one that society is prepared to recognize as reasonable.'" *Brown, supra,* 627 A.2d at 502 (quoting *Minnesota v. Olson,* 495 U.S. 91, 95–96, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990)). Moreover, "'a legitimate expectation of privacy turns on consideration of all of the surrounding circumstances,

including but not limited to defendant's possessory interest.'" *Mills v. U.S.,* 708 A.2d 1003, 1007. And, "the question of whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis." *Ortega,* 480 U.S. at 718, 107 S.Ct. 1492.

Here, the record reveals evidence that Dr. Anigbo and the other appellants had a subjective expectation of privacy as manifested not only by the school policy of "keep[ing] the [school] door locked, . . . admit[ting] a visitor only if the visitor rang the bell, and . . . mak[ing] sure an adult admitted any such visitor," but also by school staff's insistence that uninvited persons leave the premises. However, the expectations of privacy in this case were not objectively reasonable with respect to the law enforcement officers. Although a charter school "is not part of the District of Columbia public schools," D.C.Code § 38–1800.02(29)(B) (2001), it is "a publicly funded school in the District of Columbia," § 38–1800.02(29)(A). More significant, however, is the fact that some parts of the school, such as the main hallway or foyer, and the outer part of the main office, "may be so open to fellow employees [or students] or the public that no expectation of privacy is reasonable." *Ortega, supra,* 480 U.S. at 717–18, 107 S.Ct. 1492 (referencing *Katz, supra,* 389 U.S. at 351, 88 S.Ct. 507).

Despite the school policy of keeping the doors locked, the evidence in this case shows that doors leading to the main office were unlocked on December 3, 1996, providing access to anyone. There were no signs requiring use of a bell to gain admittance into the building, and even after Ms. Ferrechio had been ejected from the school earlier in the day, the center door was left ajar, allowing anyone to gain entry. In addition, employees and students routinely walked the halls and gathered in the outer part of the main office where the

activity at issue here took place. Consequently, viewing the evidence in the light most favorable to the government, we conclude that appellants did not have a legitimate expectation of privacy in the hallway or foyer, and the outer portion of the main office when Officers Best and Poe entered the school; and thus, had no standing to challenge the officers' entry into the school and the search and seizure. Even assuming appellants had standing, we are satisfied that "[their] Fourth Amendment rights were not implicated by the warrantless entry into [the common, public areas of the school] by the police." *Brown, supra,* 627 A.2d at 504.

We do not reach a different conclusion because of the presence of Mr. Owen and Mr. Salmon, as the appellants claim we should. The trial court found that the officers did not bring Mr. Owen and Mr. Salmon into the school, *see Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999), although they "should have taken steps to see to it that the newspaper photographer, who they knew

was present outside the school, did not accompany them on their investigative journey into the school." The trial court also declared that the police "should have firmly ... removed [the photographer] from the building since he had no legitimate role to play in their efforts and was clearly making their efforts impossible." Viewed in the light most favorable to the government, the record supports these findings and conclusions and we see no reason to disturb them. In short, the trial court properly denied appellants' motion to suppress.

### Defense of Property Issue

 After the government completed its case-in-chief, counsel for Dr. Anigbo raised the defense of property defense, as the trial court was considering the defense motion for judgment of acquittal. Her attorney referenced CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, no. 5.20 (4th ed.2002), and specifically mentioned Mr. Owen, the police and Ms. Ferrechio. The trial court expressed uncertainty about the defense.[16]

---

16. The trial judge said: "I'm totally unfamiliar with the law of defense of property as it relates to self-defense and things..... I'll think about it and read the instruction." The following exchange took place between Dr. Anigbo's attorney and the trial judge:

Ms. Holt: [This defense] allows you to remove a trespasser from your property, okay. And it is in the Government's evidence in this case. And as to Mr. Owen I think it is quite clear that my client considers him a trespapsser. [N]ow as to the police it's going to turn on how we see that other issue [relating to the charge of assault on a police officer with respect to Officers Best and Poe] ....

The Court: I'll think about it and read the instruction. What other particularized legal arguments have you?

Ms. Holt: As to Ms. Ferrechio in the earlier incidents and to the ejection of her from the building, ... non-deadly force was used, which is one of the touchstones for defense of property.

The Court: I think that's right, non-deadly force.

Ms. Holt: Ms. Ferrechio clearly says as far as the ejection of her from the building, to whatever extentthey're arguing, that she refused to leave.

The Court: And she was picked up and put out.

Ms. Holt: Picked up and put out. Once again from the instruction you can use non-deadly force to eject somebody from the premises.

The Court: So your argument with regard to the defense of property refers to the three Susan Ferrechio counts (sic) and the Clifford Owen count.

Ms. Holt: Exactly. Except let me address specifically the taking property without a right separately ....

The Court: In an MJOA [it] seems to me when I view it in the light most favorable, as long as her testimony is extant, I'm going to deny a motion on that ground.

At the next day of the trial, before the defendants presented their cases, the trial court rejected the defense of property defense. As to the assault count involving Ms. Ferrechio, the trial court reasoned that "each of those assaults sweep within them allegations of conduct in the main office, that viewed in the light most favorable to the Government was not aimed at [ejecting] a trespasser but in getting a notebook at a minimum." With regard to the assault of Mr. Owen, the court stated: "I just think that on these facts this doctrine cannot common-sensically have any application." The trial judge added: "The long and short of it is that it just cannot be that one can resort to force in a matter of moments while the police are standing there." Moreover, "it [was not] clear [to the trial judge that Mr. Owen was asked to leave before physical steps were taken." And, concerning the assaults charged with respect to Officers Best and Poe, the trial judge said: "[I]t goes without saying it seems to me that you can't use [this doctrine of self help with regard to trespassers on your property] as to the police, that you can't, certainly not on the facts such as these, where the police have been present on your property for a matter of time less than five minutes, use physical force to eject them in the course of a criminal investigation from the property." In reaching its conclusions, the trial judge referenced the "[LAFAVE] Treatise on criminal law."

After the presentation of the case for the defendants and the closing arguments, the trial court rendered its verdict as to all of the counts in the indictment. When Ms. Holt reminded the court that it "did not make findings regarding the claims of trespass with regard to both [Ms.] Ferrechio and——," the trial judge interrupted her and said:

> I'm happy to talk about that for a moment. You're right, I didn't actually. I thought that I'd explained my view of that but I should probably do so with—— in a minute with more clarity.

> [D]uring trial I cited to you some treatise[ ] discussions of the defense of property and the ability of people to use force [in defense of] property in ejecting trespassers, and we talked about the LAFAVE treatise. I think those, and there are more treatises that discuss it, I think that they require that a person be told to leave and that the use of force be necessary to expel a person not entitled to be there, and that the amount of force, be reasonable, and on all of the evidence at this trial, for reasons that I think we've discussed before, which you're quite right I didn't mention in this final ruling, with regard to any complainant that it would apply to, I am not persuaded that your theory applies on these facts. Your position is, I think, carefully set forth ... in the record.

The trial court also denied appellants' motion for a new trial. As the trial judge summarized, their "argument is that the [c]ourt failed to apply to defendants an applicable defense—— the right to use force in defense of one's property—— and refused to make findings in that regard." In response to this argument, the trial court asserted in full:

> The short answer to defendants' contentions is that the [c]ourt considered their proffered defense and found, for reasons discussed at several points during the trial, that the evidence did not support application of the defense to any defendant for any crime charged. One such discussion took place at counsel's request at the time the [c]ourt rendered its ruling on August 8, 1997. The [c]ourt does not have a transcript of the trial proceedings, but remembers a further explicit discussion with counsel re-

garding the reasons for the inapplicability of the particular proffered defense at [the] time motions for judgment of acquittal were made, discussed, and ultimately denied. In this [c]ourt's view, the evidence adduced at trial offers no support for the defense theory that defendants' conduct was justified by legal doctrines giving citizens a right to use force to defend their property from trespass.

*Id.*

In essence, Dr. Anigbo and Ms. Smith contend on appeal that the trial court abused its discretion in denying their motion for a new trial because the court did not properly consider their defense of property defense. They maintain that complainants "Ferrechio, Owen, Poe and Best consistently testified that they refused to leave the [Garvey Charter School] when instructed." And, they assert that: "If this had been a jury trial and the [c]ourt had refused to instruct a jury on an affirmative defense raised by the evidence, the error would certainly be deemed harmful and reversible." The government primarily argues that the trial court considered and properly rejected the defense of property defense and did not abuse its discretion in denying appellants' motion for a new trial.

 " 'Absent a clear showing of abuse of discretion, decisions of the trial court regarding the denial of a new trial will not be disturbed on appeal.' " *Graham v. United States*, 703 A.2d 825, 830 (D.C.1997) (quoting *Smith v. United States*, 466 A.2d 429, 432 (D.C.1983) (citations omitted)). However, "[a] motion for a new trial requires 'consideration of all the evidence, both favorable and unfavorable.' " *Railan v. Katyal*, 766 A.2d 998, 1013 (D.C.2001) (quoting *Lyons v. Barrazotto*, 667 A.2d 314, 324 (D.C.1995)) (internal quotations and citations omitted).

Since 1971, the court has addressed the application of the defense of property defense only once and rejected it in a case where the defendant was "vindicating a principle" rather than defending his property. *Doby v. United States*, 550 A.2d 919, 920 (D.C.1988). Earlier, in *Shehyn v. United States*, 256 A.2d 404, 406 (D.C. 1969), the court articulated the basic principle governing the defense of property defense: "It is well settled that a person may use as much force as is reasonably necessary to eject a trespasser from his property, and that if he uses more force than is necessary, he is guilty of assault." Furthermore, the District's criminal jury instruction no. 5.20 provides, in part:

A person is justified in using reasonable force to protect his/her property from trespass or theft when s/he reasonably believes that his/her property is in immediate danger of an unlawful trespass or taking and that the use of such force is necessary to avoid the danger

. . . .

The defendant is not required to prove that s/he acted in defense of his/her property. If evidence of defense of property is present, the government must prove beyond a reasonable doubt that the defendant did not act in defense of his/her property. If you find that the government has failed to prove beyond a reasonable doubt that the defendant did not act in defense of property, you must find the defendant not guilty.

This instruction comports with similar instructions codified in most states. *See* LAFAVE, SUBSTANTIVE CRIMINAL LAW § 10.6, vol. 2 (2003) ("One is justified in using reasonable force to protect his [or her] property from trespass or theft, when he [or she] reasonably believes that his [or her] property is in immediate danger of such an unlawful interference

and that the use of such force is necessary to avoid that danger.").

█ We turn now to an application of the defense of property defense to the charged assaults of Dr. Anigbo and Ms. Smith against Officers Best and Poe inside the main office or its doorway, during the second entry into the Garvey Charter School on December 3, 1996. The trial court's rejection of the defense where police officers are conducting a criminal investigation is consistent with a trend on the part of some jurisdictions. As LA-FAVE reports in his treatise: "[S]ome courts, by analogy to the modern rule disallowing force to resist an unlawful arrest, have held force is inappropriate against a police officer's seizure of property." *Id.* § 10.06(a). In deviating from the common law rule allowing a person to resist an unlawful arrest forcibly, one court determined "that this rule is no longer consistent with the needs of modern society and should be abrogated." *Commonwealth v. Moreira,* 388 Mass. 596, 447 N.E.2d 1224, 1226 (1983).[17] The court "conclude[d] that in the absence of excessive or unnecessary force by an arresting officer, a person may not use force to resist an arrest by one he knows or has good reason to believe is an authorized police officer, engaged in the performance of his duties, regardless of whether the arrest was unlawful in the circumstances. *Id.* at 1227 (citation omitted).

In New Hampshire, a state which codified the common law rule allowing the reasonable use of force to defend one's property, the Supreme Court declared that there are limits to the common law rule:

> To say that a statute designed to permit and condone self-help as a way of protecting oneself from the actions of tortfeasors, wrongdoers, and run-of-the-mill miscreants authorizes the use of force against a police officer discharging his duties in the removal of an automobile from disputed turf is to stretch the statute past the breaking point.

*State v. Haas,* 134 N.H. 480, 596 A.2d 127(1991). Similarly, in the case before us, application of the common law defense of property defense to preclude proper police investigation of criminal allegations within the common, public areas of a school building is inconsistent with society's larger interest in the fair and timely administration of its criminal laws. Consequently, we hold that where, as here, the police have entered the common, public areas of a school building without excessive force to investigate a criminal complaint, school personnel who have been charged with assault of one of those police officers within the school, are not entitled to the defense of property defense. We also hold that a school employee, such as Ms. Gatlin, who has been charged with assault of a newspaper photographer within the school may not rely on the defense of property defense where the employee is able to seek the assistance of police officers who are on the scene to protect the integrity of the school building. Consequently, we con-

---

17. *But see State v. Wiegmann,* 350 Md. 585, 714 A.2d 841, 851–52 (1998) ("[W]e decline to abolish the long-standing common law privilege permitting persons to resist an illegal warrantless arrest. We believe this change is best left to the Legislature and its primary power to, in the first instance, declare the public policy of this state."). Notably, the Congress of the United States amended District of Columbia law in 1970 to provide that:

"It is neither justifiable nor excusable cause for a person to use force to resist an arrest when such arrest is made by an individual he has reason to believe is a law enforcement officer, whether or not such arrest is lawful." District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L. No. 91–358, 84 Stat. 473 (July 29, 1970); currently codified at D.C.Code § 22–405 (2001).

clude that the trial court did not abuse its discretion in denying the new trial motion of appellants relating to the charged assaults of Officers Best and Poe, and photographer Owen.

We turn now to the assault charged against Ms. Gatlin and Dr. Anigbo with respect to Ms. Ferrechio's first entrance into the Garvey Charter School on December 3, 1996. Criminal jury instruction no. 5.20 specifies in pertinent part that: "The defendant is not required to prove that [he] acted in defense of [his] property." Rather, "[i]f evidence of defense of property is present, the [burden is on the] government [to] prove beyond a reasonable doubt that the defendant did not act in defense of [his] property."

The record does not show that the trial court made comprehensive factual findings and credibility determinations, relevant to the defense of property defense and Ms. Ferrechio's first entry into the Garvey Charter School, at the end of the presentation of all evidence, although it made some findings at the close of the government's case-in-chief. Nevertheless, based upon our review of the record and transcripts before us, we are satisfied that even if the defense of property defense arguably was available to Dr. Anigbo and Ms. Gatlin when Ms. Ferrechio first entered the school and encountered Dr. Anigbo, their use of force was unreasonable. Even assuming, without deciding, that upon seeing Ms. Ferrechio, Dr. Anigbo said: "[W]hat are you doing here? I have no appointment with you. Why are you interviewing my students? Get out, I want you out," she almost immediately demanded the no-

tebook in Ms. Ferrechio's hands. By her own testimony, Dr. Anigbo told Ms. Ferrechio, "you're not going out of here with my note pad, give me back my note pad," and then "reached for the note pad and snatched it out of [Ms. Ferrechio's] hand." This action, as the trial court concluded, was not directed at removing a trespasser but at retrieving a notebook, and Dr. Anigbo had no right to use any force to obtain possession of the notebook since the trial court found that it did not belong to her.[18] Indeed, Dr. Anigbo did not claim that the notebook was hers when Officer Taylor remarked: "Well, ma'am, regardless of what someone had written in their (sic) notebook, you had no right to take that from anybody." Dr. Anigbo replied that Ms. Ferrechio "had no right to that information," but did not assert that the note pad was hers. And, in responding to questions posed by Captain Smith, Dr. Anigbo referred to the note pad as "the reporter's notebook." On this record, then, Dr. Anigbo could not have had a reasonable belief that the note pad belonged to her.

Even assuming that Dr. Anigbo reasonably believed that the note pad was hers, and that the school personnel were entitled to eject Ms. Ferrechio from the school, the record shows that the amount of force used to accomplish that goal was not reasonable, even taking into account the trial court's statement that Ms. Ferrechio "may have exaggerated the size and veracity (sic) of the attack upon her." As we declared in *Shehyn, supra,* 256 A.2d at 406: "It is well settled that a person may use as much force as is reasonably necessary to

---

**18.** On the point of ownership of the note pad, the trial declared in his final findings and conclusions:

> I am firmly convinced that Dr. Anigbo took [Ms.] Ferrechio's notebook, Dr. Anigbo's explanations regarding the notebook are filled with inconsistencies, and in my judgment

simply in the end do not have the ring of truth.

> It makes no sense to me that she would not produce her own notebook, given her allegations of its theft when production of it could provide empirical proof of the truth of Dr. Anigbo's version.

eject a trespasser from his [or her] property, and that if he [or she] uses more force than is necessary, he [or she] is guilty of assault." In summary, even if the defense of property defense arguably was available to Dr. Anigbo, and recognizing that in that case, the burden of proof shifted to the government to disprove the defense, we are satisfied that the trial judge could find beyond a reasonable doubt that Dr. Anigbo and Ms. Gatlin were guilty of the assault on Ms. Ferrechio.

■ We address the remaining arguments of the appellants summarily. We affirm the convictions of Dr. Anigbo and Ms. Gatlin on count two of the indictment, taking property (Ms. Ferrechio's notepad) without right. Based upon testimony by Officer Taylor, Captain Smith, the portion of Ms. Ferrechio's testimony that the trial court credited, and Dr. Anigbo's own testimony, we are satisfied that the trial court properly found beyond a reasonable doubt that the notepad belonged to Ms. Ferrechio, that Dr. Anigbo was guilty of taking Ms. Ferrechio's notebook without right, and that Ms. Gatlin was "an intentional, active participant in the offense of taking property without right." We also affirm the conviction of Ms. Gatlin on count three of the indictment, assaulting Mr. Owen. Mr. Owen testified that Ms. Gatlin "reached over the police officers and punched [him]" in the shoulder area with her "fist," and the trial court determined that "his account [was not] meaningfully impeached in any way....." Hence, contrary to Ms. Gatlin's contention, there was sufficient evidence beyond a reasonable doubt to convict her of the assault on Mr. Owen.

■ Finally, we consider the remaining challenges of Dr. Anigbo and Ms. Smith to their convictions on counts five and six of the indictment, the assaults on Officers Best and Poe. They assert that

"[t]here is no such chargeable offense in the District of Columbia as misdemeanor assault on a police officer." They argue that they were entitled to a jury trial because, in reality, they were charged with "a jury demandable felony offense, [a]ssault on a[p]olice [o]fficer (APO) § 22–505 governing encounters between police officers and citizens," rather than the "non-jury demandable offense, [s]imple [a]ssault, § 22–504 governing encounters between police officers and citizens." We previously rejected this argument: "Simple assault is a lesser-included offense of assault on a police officer." *McDonald v. United States*, 496 A.2d 274, 276 (D.C. 1985); *see also Speed v. United States*, 562 A.2d 124, 127 (D.C.1989). In addition, we said in *Evans v. United States*, 779 A.2d 891, 895 (D.C.2001): " 'If the facts show a violation of two or more statutes, an election may be made to prosecute under either.' " *Id.* at 895 (quoting *United States v. Young*, 376 A.2d 809, 812 (D.C.1977)). The government made its election, and since they were charged with the non-jury demandable simple assault offense, Dr. Anigbo and Ms. Smith were not entitled to a jury trial.

■ Dr. Anigbo and Ms. Smith also argue that the trial court's factual findings regarding their alleged assault against Officers Best and Poe were clearly erroneous, and that Ms. Ferrechio's testimony was "inherently incredible." They base their argument in large measure on photographs introduced into evidence. In adjudging Dr. Anigbo and Ms. Smith guilty of assaulting the police officers, the trial court determined that the government proved the assaults "that took place in the [main] office or in its doorway." Given the testimony of Officers Best and Poe, which the trial court credited in material part, and our review of the record, there was sufficient evidence beyond a reasonable

doubt to convict Dr. Anigbo and Ms. Smith of assaulting these officers. Moreover, the trial court identified the portions of Ms. Ferrechio's testimony that it deemed "troubling" and those which it credited. Hence, we see no basis for rejecting her entire testimony as "inherently incredible."

Accordingly, for the foregoing reasons, we affirm the convictions of Ms. Gatlin on counts one, two and three of the indictment (assault on Ms. Ferrechio, taking property without right and assaulting Mr. Owen). We also affirm the convictions of Dr. Anigbo on counts one, two, five and six of the indictment (assault of Ms. Ferrechio, taking property without right, and assaulting Officers Best and Poe). And, we affirm the convictions of Ms. Smith on counts five and six of the indictment (the assaults on Officers Best and Poe).

*So ordered.*