George **FADERO**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 11–CF–1571.

District of Columbia Court of Appeals.

Argued Dec. 6, 2012.
Decided Jan. 31, 2013.

Stephen Domenic Scavuzzo, Vienna, for appellant.

Elana Suttenberg, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Elizabeth Trosman, Chrisellen Kolb, and Jin Park, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER and OBERLY, Associate Judges, and FERREN, Senior Judge.

FERREN, Senior Judge:

Appellant George Fadero brings multiple challenges to his convictions for felony assault on a police officer while armed (APOWA)[1] and related charges[2] arising out of an incident on February 12, 2011, as well as his convictions for unlawful possession of a controlled substance (marijuana)[3] and related charges[4] attributable to the search incident to his arrest on February 25, 2011. He contends that (1) the charges assignable to these two separate dates were improperly joined and, in any event, that the trial court abused its discretion in denying his motion to sever the two categories of offenses for separate trials. He adds that (2) the trial court erred in admitting in evidence two redacted "radio run" recordings of the police officer's conversations with his dispatcher, and (3) further erred when instructing the jury on the elements of APOWA. Finally, he says, (4)

the evidence was insufficient to support his convictions for APOWA and the related charges of ADW, fleeing from the scene of an accident after causing personal injury, and fleeing from a police officer in a motor vehicle.[5] Finding no error, we affirm all convictions except for ADW, which merges with appellant's conviction for APOWA[6] and must be remanded, accordingly, for the trial court to vacate.

## I.

According to the government's evidence, on the morning of February 12, 2011, Metropolitan Police Department Officer James O'Gorman was sitting in a marked police car in a parking lot off of New York Avenue, N.E. Shortly after 9:00 a.m., a white Dodge van entered the lot, then headed back onto New York Avenue in the same eastbound direction. Officer O'Gorman followed the van and initiated a traffic stop after watching the van make several unsafe lane changes. The officer drove behind the van for about half a mile with his lights and siren on before the van came to a stop in front of the Washington Times building. At this point, the officer notified the dispatch officer of his location, requested backup, and left his vehicle to approach the van.

When Officer O'Gorman reached the driver's side door, the driver lowered his

---

1. D.C.Code § 22–405(c) (2007 Supp.); § 22–4502 (2001). The first section covers felony Assault on a Police Officer (APO); the second section adds punishment if the assault is "while armed."

2. Assault with a Dangerous Weapon (automobile) (ADW), D.C.Code § 22–402 (2001); Fleeing from Scene of Accident after Causing Personal Injury, D.C.Code § 50–2201.05(a)(1) (2001); Fleeing from a Law Enforcement Officer in a Motor Vehicle, D.C.Code § 50–2201.05b (b)(2) (2001).

3. D.C.Code § 48–904.01(d) (2001).

4. Operating an Unregistered Motor Vehicle, D.C.Code § 50–1501.04(a) (2001); Operating a Motor Vehicle after Suspension of a Driver's License, D.C.Code § 50–1403.01(e) (2001); Operating a Motor Vehicle Without a Permit, D.C.Code § 50–1401.01(d) (2001); Altering a Motor Vehicle Permit, DCMR § 18–1110.2 (1995); and Operating a Motor Vehicle with Expired Tags, DCMR § 18–1101.3 (1995).

5. See *supra* notes 1 & 2.

6. See *Ball v. United States,* 26 A.3d 764, 771 (D.C.2011).

window between two and three inches and asked, "Why did you stop me?" O'Gorman informed the driver of the unsafe lane changes and asked for his license and registration. The officer was looking right at the driver and could see the left sleeve of the driver's black leather jacket resting on the window sill. Notably, the sleeve had "NFL" written in yellow lettering. At that point, the driver looked over to the passenger's side of the van, then down at his lap. After four or five seconds had passed, the van began coasting forward, as if the driver had let his foot off of the brake. Officer O'Gorman began to bang on the side of the van, yelling at the driver, "Put it in park," but the van continued to coast forward. Once the rear of the van passed him, the officer began walking back to his car because MPD policy prohibits pursuit of a vehicle for leaving the scene of a traffic violation.

When he was nearly halfway back to his car, Officer O'Gorman heard the van's engine accelerate. He looked back just in time to see the rear of the van, moving slowly in reverse, strike him in the back. O'Gorman fell forward into the road, landing on his hands and knees. While he was on the ground, he heard the van accelerate again, this time speeding away from the scene. As soon as he got up, Officer O'Gorman got back into his car and sent a message over the radio reporting what had just happened. Once inside his car, O'Gorman pursued the van, running his lights and siren and maintaining radio contact with the dispatcher until the van left the highway, whereupon the station manager told O'Gorman to abandon the pursuit in the interest of public safety.

Officer O'Gorman returned to his police station and reported to his superior. After completing the mandatory paperwork, he was taken to the hospital where his back was examined. The doctor observed red marks on his back and prescribed medication to help ease his pain. O'Gorman's supervisor directed him not to work the next day, a Sunday, and to report to the department clinic on Monday morning for follow-up. After his check-up on Monday morning, O'Gorman returned to work. Also on the 13th, Officer O'Gorman met with two other MPD officers to look at a photo array. It contained nine photos from which O'Gorman was able to identify appellant Fadero immediately.[7]

Nearly two weeks later, on February 25, 2011, U.S. Marshals—who had located Fadero and kept him under surveillance— executed an arrest warrant for Fadero at the motor vehicle inspection station at 1001 Half Street, S.W. The marshals surrounded a white van, confirmed Fadero's identity, and followed him out of the van into the inspection building, where they placed him under arrest. At the time of arrest, Fadero was wearing blue jeans, a white t-shirt, and a black leather Redskins NFL jacket. The marshals performed a search of Fadero incident to his arrest and found on him an identification card, a driver's license (later found to be falsified), a substance (later determined to be marijuana), and more than $2,000 in cash. Officer O'Gorman was summoned to the scene, and when he arrived he saw the marshals detaining a man (Fadero) whom he immediately recognized and identified as the driver of the van on February 12. O'Gorman also recognized and identified (with the help of identical tag numbers) the

---

7. It is not clear from the record how the photo array was put together; we know only that Officer O'Gorman's colleagues showed the array to him at a Wendy's restaurant located between the police station and O'Gorman's home. Nothing about the photo array is contested here.

white van at the inspection station as the van that Fadero had been driving on the 12th. Finally, Officer O'Gorman observed that Fadero was wearing the same style black leather jacket with the same yellow NFL logo on the sleeve that O'Gorman had seen when he approached the van on February 12.

## II.

### A.

 Citing Super. Ct.Crim. R. 8(a),[8] Fadero filed a pre-trial motion challenging joinder of the offenses from February 12 and February 25 for one trial. He argued in the alternative that even if properly joined, the offenses from the 12th and the 25th should be severed for separate trials pursuant to Super. Ct. Crim R. 14[9] to avoid "unfair prejudice." We review *de novo* an alleged misjoinder, an error of law.[10] If we uphold the joinder, however, we must give "great deference" to the trial court's severance ruling and reverse only upon a "clear showing of abuse of discretion."[11]

 Fadero contends that (1) the assault-related offenses from February 12th were not of the "same or similar character" as the traffic and drug-related offenses from February 25; that (2) these incidents were "totally unrelated"; and that (3) they were not part of a "common plan or scheme"—thereby failing to meet Rule 8(a) criteria.[12] Fadero stresses that the overlap in evidence from the two incidents at the joint trial of all the charged offenses created "a substantial risk of prejudice that the jury [would] infer guilt by cumulating evidence"; that, in fact, "the jury did confuse the issues and so informed the judge"; and therefore that he "is entitled to a new trial on the charges of unlawful possession of marijuana, operating an unregistered motor vehicle, operating after suspension, no permit, altering a driver's license and expired tags."[13]

We agree with Fadero's rejection of the first and third arguments that the incidents were not of the "same or similar character" or part of a "common scheme or plan"; but, like the trial court, we cannot agree that the charges attributable to the two February incidents are "totally

**8.** Super. Ct.Crim. R. 8(a) provides:

> Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan.

**9.** Super. Ct.Crim. R. 14 provides:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the Court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the Court

may order the prosecutor to deliver to the Court for inspection in camera any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

**10.** *Ball, supra* note 6, 26 A.3d at 767.

**11.** *Bailey v. United States*, 10 A.3d 637, 642 (D.C.2010) (internal quotation marks omitted).

**12.** *See* Super. Ct.Crim. R. 8(a), *supra* note 8.

**13.** It is interesting to note that, on the joinder/severance issue, Fadero challenges only his convictions of the offenses attributable to the February 25 incident. He apparently assumes that the evidence flowing from the assault on February 12 was so inflammatory that it prejudiced the jury's consideration of the February 25 offenses—but not vice versa.

unrelated" within the meaning of Rule 8(a). According to express language in the rule, joinder is proper if "2 or more acts or transactions [are] connected together." [14] Fadero finds no such connection primarily because the February incidents occurred "two weeks apart." That temporal distinction, however, does not fit the test.

■ Our "predominant consideration" when deciding whether offenses are properly joined is whether the joinder "would serve the goals of trial economy and convenience," [15] thereby avoiding the need for "duplicating proof at successive trials." [16] Accordingly, we have ruled that two offenses are "connected together" within the meaning of Rule 8(a) if "proof of one crime constitutes a substantial portion of proof of the other." [17] In the context here, this means that when a defendant challenges joinder of offenses charged for two separate dates, joinder will be proper when evidence from offenses charged for one date bears substantially on offenses charged for the other date.[18] We have said, moreover, that the overlapping evidence need not be "reciprocal"; [19] there need not be mutual admissibility. That is to say, if trials of the charges for each date

were held separately, evidence from only one—not both—would have to reflect a "substantial portion" of the proof required for the other. Finally, acknowledging that proper joinder can be prejudicial on occasion, we have emphasized that "[a]ny undue prejudice can be avoided by grant of severance under Super. Ct.Crim. R. 14." [20]

In this case, the evidence showed that the "acts or transactions" resulting in the offenses committed on February 12 and 25 were "connected together" [21] within the meaning of Super. Ct.Crim. R. 8(a). In three respects, proof of the February 25 offenses constitutes a "substantial portion of the proof" of the February 12 offenses [22] : (1) The white van that Fadero was driving on the 25th matched the description of the van the suspect was driving on the 12th, including not only the physical attributes but also the very same license plate. Photos of the van taken on the 25th were used to aid Officer O'Gorman's testimony describing the incident on the 12th; (2) Fadero's arrest on the 25th also allowed O'Gorman to confirm his earlier identification from the photo array, as he immediately recognized Fadero as the man who had been driving the white van that struck

---

14. Super. Ct.Crim. R. 8(a), *supra* note 8.

15. *Gooch v. United States*, 609 A.2d 259, 264 (D.C.1992) (quoting *Blunt v. United States*, 404 F.2d 1283, 1288 (D.C.Cir.1968)).

16. *Id.*

17. *Id.* (quoting *United States v. Montes–Cardenas*, 746 F.2d 771, 776 (11th Cir.1984)).

18. We have stressed that "[j]oinder is not automatic upon proof that the evidence would be admissible in separate trials." *Id.* at 264 n. 7 (citing *Montes–Cardenas, supra* note 17, 746 F.2d at 777 n. 10). "Rather, the focus must be on whether the offenses are connected so that there is a *substantial* overlap of proof." *Id.* (emphasis added) (citing *Montes–Cardenas, supra* note 17, 746 F.2d at 776).

No issue is presented here as to what "substantial portion" means when, as here, there are multiple charges for each date. As we shall see, evidence from the February 25 arrest and search is germane to all charges for the incident on February 12.

19. *Id.* at 264 ("Reciprocal admissibility is not the test in determining whether offenses can be joined properly under Rule 8(a)." (citing *Winestock v. United States*, 429 A.2d 519, 524 (D.C.1981))).

20. *Id.;* see *supra* note 9.

21. See *supra* note 8.

22. *Gooch, supra* note 15, 609 A.2d at 264 (quoting *Montes–Cardenas, supra* note 17, 746 F.2d at 776).

him on the 12th; and (3) finally, in addition to the physical evidence linking the two sets of offenses, several items discovered on Fadero on the 25th during the search of his person provided a motive that explains Fadero's aggression and flight on the 12th. His possession of illegal drugs, a falsified driver's license, and an expired license plate on the 25th manifested reasons why the individual stopped by Officer O'Gorman on the 12th might have fled from the scene of the traffic stop and hit the officer with the van in doing so.

Although reciprocal admissibility is not required for proper joinder, evidence from the offenses on the 12th also provided substantial proof of the offenses on the 25th. If not for the arrest warrant (based on O'Gorman's photo identification) issued because Fadero fled the scene of the assault on the 12th, the U.S. Marshals would not have arrested Fadero on the 25th and discovered the illegal drugs, falsified driver's license, and expired license plates that served as grounds for convictions. In sum, because of the substantial overlap in evidence for the charges attributable, respectively, to acts or transactions on February 12 and 25, the offenses committed or revealed on those separate days were "connected together" within the meaning of Super. Ct.Crim. R. 8(a) and thus properly joined for trial.[23]

## B.

 Having concluded that the offenses were properly joined, we review for abuse of discretion the denial of Fadero's motion to sever under Super. Ct.Crim. R. 14. To meet this burden, appellant must demonstrate "the most compelling prejudice ... from which the court would be unable to afford protection if both offenses were tried together."[24] The court may grant relief under Rule 14 if it appears that "(1) the jury may cumulate evidence of separate crimes to find guilt; (2) the jury may improperly infer a criminal disposition and treat the inference as evidence of guilt; or (3) the defendant may become embarrassed or confounded in presenting different defenses to different charges."[25]

 Fadero argues, primarily, that he was prejudiced by the court's refusal to sever because the jury was confused about which dates applied to which offenses. We understand this contention to mean that the jurors were likely to have taken evidence of crimes from one date to find guilt of crimes on the other date—an improper "cumulation" of evidence.[26] To the contrary, however, upon the jury's request for clarification, the court resolved any confusion about dates by directing the jurors to the verdict form, which clearly indicated which offenses allegedly occurred on what dates.[27]

23. *See Gooch, supra* note 15, 609 A.2d at 264.

24. *Bright v. United States*, 698 A.2d 450, 454 (D.C.1997) (internal quotation marks omitted).

25. *Bell v. United States*, 332 A.2d 351, 353 (D.C.1975).

26. *See id.*

27. THE COURT: The note reads jurors are requesting clarification for charge operating a motor vehicle. Does this date refer to February 12, and February 25, or both?

What is defined highway in D.C.? Is Half Street or any public road in D.C. considered a highway? Are all driving offenses related to the dates February 12, or February 25, or both? If charges apply to both dates are multiple—are multiple counts to be considered?
I propose[ ] we respond as follows: Ladies and Gentlemen, this is in response to your note. You will see from the verdict form, the operating an unregistered motor vehicle charge relates to February 25th, 2011, only. The verdict form also shows the relevant dates for each of the charged offenses, each

Any danger that the jury would cumulate evidence was substantially reduced, moreover, because the incidents described for February 12 and 25, respectively, were wholly different from one another—as appellant himself recognizes—and, further, because each of the offenses with which Fadero was charged required different elements of proof from one another, conveyed to the jury by the instructions. Finally, at trial, the evidence of the events on February 12 and 25 was, for the most part, presented sequentially.[28] Accordingly, "the evidence as to each offense [was] sufficiently simple and distinct" that there was "little risk that the jury would amalgamate the evidence unfairly." [29]

We do not ignore that the assaultive events of February 12 were more serious, even inflammatory, to a degree higher than those that occurred on February 25. Nonetheless, their proper joinder for trial under Super. Ct.Crim. R. 8(a), when coupled with the foregoing analysis of the trial record and the deference we owe discretionary judgments under Super. Ct.Crim.

> of which relates to February 12th, 2011, or February 25th, 2011, but not to both dates. A highway means any public road in the District of Columbia.
> Is that satisfactory to the Defense?
> [COUNSEL]: That's fine, Your Honor.

**28.** Officer Mathis testified as to his perceptions on February 12 of Officer O'Gorman's injuries earlier that day. Next, Officer O'Gorman testified as to the events on the 12th, then about his viewing the photo array on the 13th, and finally about the events on the 25th; Officer O'Gorman's testimony was divided so that the two week period between the events was clearly established. Sergeant Petz then testified as to the presentation of the photo array to Officer O'Gorman on the 13th, followed by the testimony of Deputy Marshal Gause, who arrested Fadero at the motor vehicle inspection station and testified as to the events on the 25th.

**29.** *Reyes v. United States*, 933 A.2d 785, 794 (D.C.2007) (citing *Bell, supra* note 25, 332 A.2d 351).

R. 14, convince us that the trial court did not abuse its discretion in denying the severance requested by Fadero's trial counsel.

## III.

■ Appellant challenges the trial court's admission of two redacted radio transmissions (commonly called "radio runs") between Officer O'Gorman and a police dispatcher. These, he says, contained prejudicial hearsay. During a pretrial conference, defense counsel objected to all hearsay portions of the unredacted version of the audio recordings where Officer O'Gorman was "talking about what just happened to him." The trial court reviewed the tape and ordered redactions of hearsay that the court did not consider to be either "excited utterances" [30] or "present sense impressions." [31] Later, when the redacted version of the recording was admitted in evidence at trial, counsel did not object.[32]

**30.** *See Nicholson v. United States*, 368 A.2d 561, 564 (D.C.1977) (permitting admission of statement by declarant within reasonably short time after serious occurrence that caused state of nervous excitement or physical shock, such that totality of circumstances suggests spontaneity and sincerity of statement).

**31.** *See Hallums v. United States*, 841 A.2d 1270, 1276 (D.C.2004) ("permitting admission of statements describing or explaining events which the declarant is observing at the time he or she makes the declaration or [statements made] immediately thereafter").

**32.** *See Abdulshakur v. District of Columbia*, 589 A.2d 1258, 1265 (D.C.1991) ("[H]earsay evidence admitted without objection may be properly considered by the trier of fact and given its full probative value." (quoting *Mack v. United States*, 570 A.2d 777, 782 (D.C. 1990))).

 Fadero argues on appeal that several statements which should have been redacted from the radio runs as hearsay were admitted to his "substantial prejudice." Because of his failure to object at trial, we review for plain error.[33] Accordingly, to achieve reversal, Fadero must demonstrate that (1) the recording was admitted in "error," that (2) "the error is plain," and that (3) it affected his "substantial rights."[34] "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."[35]

There is confusion about what statements were and were not admitted in evidence from a disk transcription. Fadero references three hearsay statements by Officer O'Gorman that he claims were played erroneously before the jury: (1) "he almost hit me and just pulled away outbound New York Avenue"; (2) he "tried to run me over"; and (3) "Be advised that he did hit me." The government represents that, after redaction, only a version of the first statement Fadero cites was admitted, not all three, and that the statement was different from the one Fadero proffered. According to the government, O'Gorman reported: "Someone just hit me, just pulled away," not merely that someone—as Fadero claims—"almost" did so. Having listened to the recording—not easy to understand—we are inclined to agree that Fadero's version of the first statement, "he almost hit me," is accurate, but we agree with the government that Fadero's other two proffered statements were not on the recording played for the jury.

We need not determine to a certainty what statements were actually in evidence or, in, any event, whether any of them conforms to, or falls outside of, the "excited utterance" or "present sense impression" exceptions to the hearsay rule.[36] Let us assume that the first statement, as Fadero has proffered it ("he almost hit me"), came to the jury's attention. And we must accept, as the tape reveals (and the government argues), that only one statement, the first, came before the jury. It follows that Fadero was helped by admission of the statement, as it impeached Officer O'Gorman's trial testimony that Fadero's van actually hit the officer. Therefore, even if we assume that the admission of this statement was plain error, the admission did not affect Fadero's "substantial rights," nor in any way tarnish "the fairness, integrity, or public reputation of judicial proceedings."[37]

## IV.

 Fadero next challenges the jury instruction defining "significant bodily injury" under the APOWA statute. Because counsel did not object to the instruction as given, we normally would review for plain error.[38] Perceiving no error at all, however, we prefer to rule on the merits, sustaining the trial court's statutory interpretation as guidance for the future.[39]

**33.** *See Hunter v. United States,* 606 A.2d 139, 144 (D.C.1992).

**34.** *Thomas v. United States,* 914 A.2d 1, 8 (D.C.2006) (citing *Johnson v. United States,* 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)).

**35.** *Id.* (internal quotation marks omitted).

**36.** See *supra* notes 30 & 31.

**37.** *Thomas, supra* note 34, 914 A.2d at 8.

**38.** See *supra* notes 33–35 and accompanying text.

**39.** Because defense counsel not only failed to object but also expressly agreed to the court's *proposed definition of "significant bodily injury,"* the government invokes the invited error doctrine to argue that Fadero is bound by the

We begin with the APO statute itself.[40] D.C.Code § 22–405(c) (2007 Supp.) provides: "A person who violates subsection (b) [41] of this section and causes *significant bodily injury* to the law enforcement officer, or commits a violent act that creates a grave risk of causing *significant bodily injury* to the officer, shall be guilty of a felony...." (emphasis added). The term "significant bodily injury," is not defined. In the jury instructions, however, the trial court defined "significant bodily injury" as "an injury that requires hospitalization or immediate medical attention," and the jury in this case was so informed.

Fadero argues that this definition is "insufficient" and "incomplete," urging that the statute requires for conviction a more serious injury, namely, "a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of a bodily member, organ or mental faculty." [42] He takes that language from a different offense (aggravated assault) that requires a "serious" bodily injury, not the "significant" bodily injury that concerns us here. We, therefore, turn to our local assault statutes for perspective in discerning the definition that best fits APO.

Title 22, Chapter 4, of the District of Columbia Code, entitled "Assault, Mayhem, Threats," specifies several assault crimes, three of which are defined by the level of injury inflicted upon the victim: (1) aggravated assault, § 22–404.01 (requiring "serious bodily injury"); (2) felony assault, § 22–404(a)(2) (requiring "significant bodily injury"); and (3) the statute at issue here, felony assault on a police officer (APO), § 22–405(c) (also requiring "significant bodily injury").

As to the first, § 22–404.01(a), one is guilty of "aggravated assault" either (1) by "knowingly or purposefully caus[ing] serious bodily injury" or (2) "[u]nder circumstances manifesting extreme indifference to human life, ... [by] intentionally or knowingly engag[ing] in conduct which creates a grave risk of seriously bodily injury, and thereby causes serious bodily injury." The statute does not define "serious bodily injury," but this court has done so in *Nixon*, where we borrowed the definition from the Sexual Abuse chapter, D.C.Code § 22–3001(7) (2001).[43] In doing so, we adopted a "high threshold of injury" [44] for aggravated assault—the threshold that Fadero urges upon us here.[45]

In 2007, eight years after our decision in *Nixon*, the Council of the District of Columbia added a new level of assault, § 22–404(a)(2), which we have characterized as an "intermediate felony assault offense" enacted "to fill the gap between aggravat-

position his counsel took at trial. *See Brown v. United States*, 627 A.2d 499, 508 (D.C.1993) ("We have repeatedly held that a defendant may not take one position at trial and a contradictory position on appeal."). Because we reach the merits of Fadero's argument, we do not pause to address invited error.

**40.** See *supra* note 1. The "while armed" element of APOWA, with which Fadero is charged, is added by D.C.Code § 22–4502 (2001).

**41.** Subsection (b) of D.C.Code § 22–405 governs misdemeanor assault on a law enforcement officer.

**42.** *Nixon v. United States*, 730 A.2d 145, 150 (D.C.1999) (adopting definition for "serious bodily injury" in aggravated assault statute from sexual abuse statute); *accord, Jackson v. United States*, 970 A.2d 277, 279–80 (D.C. 2009).

**43.** *Nixon, supra* note 42, 730 A.2d at 150.

**44.** *In re R.S.*, 6 A.3d 854, 857 (D.C.2010).

**45.** See *supra* text accompanying note 42.

ed assault and simple assault."[46] This relatively new felony assault statute requires for conviction not "serious bodily injury," as in aggravated assault, but "significant bodily injury," defined as "injury that requires hospitalization or immediate medical attention."[47] We have observed that the Council apparently considered such injury "less serious"[48]—and this court has called it "markedly less severe"[49]—than the injury required for aggravated assault.[50]

The foregoing discussion of the felony assault statute is important because, in that same legislation[51] (and years after enactment of the aggravated assault statute), the Council enacted as companion legislation the felony APO statute, § 22–405(c), at issue here. Unlike the felony assault statute, however, the APO statute does not define "significant bodily injury." Like this court in *Nixon*,[52] therefore, we must craft a definition, assuredly not out of proverbial whole cloth but, rather, by reference to comparable definitions in other District of Columbia assault statutes.

 Contrary to Fadero's suggestion for incorporating the definition of "serious bodily injury" from the aggravated assault context into § 22–405(c), the government urges us to import the definition of "significant bodily injury" from the felony assault statute, itself a "significant bodily injury" statute. We readily agree with the government. Where a particular term is used in different sections of the same statute, we assume that the term will have a "consistent definition unless otherwise indicated or obvious from the face of the statute."[53] We believe that the same interpretive principle should apply when, as in this case, two amendments to similar statutes—here §§ 22–404(a)(2) (felony assault) and 22–405(c)(APO)—were enacted by the Council in the same bill[54] containing (at the time) the only two appearances of the phrase "significant bodily injury" in the District of Columbia Code.[55] As noted ear-

**46.** *In re R.S., supra* note 44, 6 A.3d at 858 (quoting *Jackson v. United States*, 940 A.2d 981, 986–87 (D.C.2008) and citing D.C. Council, Committee on the Judiciary, Report on Bill 16–247 at 6 (Apr. 28, 2006) (internal quotation marks omitted)).

**47.** *See* D.C.Code § 22–404(a)(2); *In re R.S., supra* note 44, 6 A.3d at 858–59.

**48.** *In re R.S., supra* note 44, 6 A.3d at 858–59.

**49.** *Id.* at 859.

**50.** In *In re R.S.*, we quoted with approval the trial judge's discussion of the definition of "significant bodily injury" under the felony assault statute, D.C.Code § 22–404(a)(2). The judge concluded that "an individual suffers significant bodily injury

where there is an injury to the body . . . that necessitates the individual being taken to the hospital or receiving medical treatment shortly after the injury was inflicted. Hospitalization or medical treatment is re-

quired where it is necessary to preserve the health and well being of the individual, *e.g.*, to prevent long-term physical damage, possible disability, disfigurement, or severe pain.

*In re R.S., supra* note 44, 6 A.3d at 859 (quoting *In re R.P.*, 136 Daily Wash. L. Rptr. 549, 552 (D.C.Super.Ct. Feb. 19, 2008)).

**51.** *See* "Omnibus Public Safety Act of 2006," D.C. Law 16–306 (West).

**52.** See *supra* note 42.

**53.** *See Carey v. Crane Serv. Co.*, 457 A.2d 1102, 1108 (D.C.1983).

**54.** See *supra* note 51.

**55.** According to the government, which Fadero does not dispute, as of the date of the offense at issue here, the term "significant bodily injury" appeared only twice in the entire D.C.Code. *See* D.C. Council, Committee on the Judiciary, Report on Bill 16–247 at 3, 5–6 (April 28, 2006).

lier, the felony assault statute—premised on "significant bodily injury" as expressly defined—reflects a legislative decision to create an "intermediate felony assault offense" enacted "to fill the gap between aggravated assault and simple assault." [56] Accordingly, we see no basis for importing a more severe definition of bodily injury from the aggravated assault statute into the APO statute. Nor is there any basis for crafting a wholly new definition not found in our assault statutes. In sum, the APO and felony assault amendments, enacted at the same time, both use the same language to characterize the crime ("significant bodily injury"), and the latter defines that phrase. We conclude that this definition surely applies under both statutes.

Because the trial court instructed the jury that "significant bodily injury" under the APO statute means "an injury that requires hospitalization or immediate medical attention," the definition found in the felony assault statute, § 22–404(a)(2), the court instructed correctly. There was no error.

### V.

▮▮▮▮ Finally, Fadero challenges the sufficiency of the evidence for his convictions of APOWA, ADW, and fleeing the scene of accident after causing personal injury.[57] He fails here. Our standard of review is firmly established. To evaluate sufficiency, we view the evidence "in the light most favorable to the [government],"

giving deference "to the factfinder's duty to determine credibility, weigh the evidence, and draw justifiable inferences of fact." [58] "The conviction will be overturned only where there has been no evidence produced from which guilt may reasonably be inferred." [59]

▮▮▮▮ Appellant focuses on his conviction for assaulting a police officer while armed. To prove felony APOWA, the government must prove the elements of simple assault: that the defendant "(1) attempted with force and violence to injure another; (2) at the time had the apparent present ability to injur[e] the victim; [and] (3) intended to perform the acts constituting the assault...." [60] The government also must show that the defendant (4) knew or should have known that the victim was a police officer,[61] (5) caused a "significant bodily injury to the law enforcement officer," or committed "a violent act that create[d] a grave risk of causing significant bodily injury to the officer," [62] and (6) was armed with a dangerous weapon.[63]

Sufficient evidence of each element is found in the trial record. Fadero backed the van into Officer O'Gorman (elements 1, 2, and 3). O'Gorman was driving a police vehicle, wearing an officer's uniform, and spoke with Fadero, as a police officer, through Fadero's open car window, all of which revealed that Fadero knew or should have known that O'Gorman was a police officer (element 4). Fadero's backing into O'Gorman, even slowly, created a

**56.** *In re R.S., supra* note 44, 6 A.3d at 858 (internal quotation marks omitted).

**57.** See *supra* notes 1 and 2.

**58.** *Lewis v. United States,* 767 A.2d 219, 222 (D.C.2001) (citing *Abdulshakur, supra* note 32, 589 A.2d at 1263).

**59.** *Id.*

**60.** *Price v. United States,* 813 A.2d 169, 175–76 (D.C.2002) (internal quotation marks omitted); *see* D.C.Code § 22–405(c) (incorporating subsection (b) (simple assault)).

**61.** *See In re J.S.,* 19 A.3d 328, 330 (D.C.2011).

**62.** D.C.Code § 22–405(c).

**63.** D.C.Code § 22–4502.

grave risk of significant bodily injury, as O'Gorman was standing, alone, at the side of a busy highway and could have been knocked very easily into oncoming traffic (element 5).[64] And last, the van is considered a dangerous weapon if it is "used in a manner that actually caused a risk of serious injury" (element 6).[65] The evidence of APOWA was therefore sufficient for conviction, as was the evidence for the lesser included offense of ADW (which, in light of this merger of offenses, must be vacated).[66]

Finally, the evidence was sufficient for Fadero's conviction of fleeing from the scene of an accident after causing personal injury. D.C.Code § 50–2201.05(a)(1) (2001) provides that any person who injures another with a vehicle must stop and give assistance to the injured party. Failure to do so can lead to a fine and imprisonment. Viewed in the light most favorable to the government, (including Officer O'Gorman's testimony that the blow from the van felt like "a real hard hit in football"), the evidence was sufficient for a finding that the driver knew he had hit Officer O'Gorman, injured him (however slightly), and did not stop to assist him.[67] The officer was able to identify the driver from a photo array the next day. Two weeks later, on February 25, Officer O'Gorman positively identified Fadero at the scene of his arrest pursuant to the warrant. Fadero challenges the consistency of these identifications, but this challenge has no merit because any question of inconsistency is for the jury.[68]

\* \* \* \* \* \*

For the foregoing reasons we affirm all convictions, although as noted[69] we remand with instructions for the trial court to vacate Fadero's conviction for ADW, which merges into his APOWA conviction.

*So ordered.*

---

**64.** Fadero's vehicle knocked O'Gorman to the ground and caused injuries sufficient to require a brief hospital visit and two days of leave. We need not evaluate whether the officer's injuries in themselves amounted to "significant bodily injury," because, unlike the felony assault and aggravated assault statutes, the APO statute requires only a "grave risk" of the required injury, which the evidence establishes here. *Compare* D.C.Code § 22–405(c)(APO), *with id.* §§ 22–404.01 (aggravated assault), *and* –404(a)(2) (felony assault); *see Ball, supra* note 6, 26 A.3d at 770 & n. 16 (APO statute contains no requirement that a defendant "actually inflict injury").

**65.** *Perry v. United States,* 36 A.3d 799, 812–13 (D.C.2011).

**66.** *See Ball, supra* note 6, 26 A.3d at 771.

**67.** *See Sandwick v. District of Columbia,* 21 A.3d 997, 1000 (D.C.2011) (holding that "a driver who knows that he or she has been involved in a collision in which there is a possibility that another person has been injured has a duty under D.C.Code § 50–2201.05(a)(1) to stop and investigate whether injury actually occurred").

**68.** *See Scott v. United States,* 954 A.2d 1037, 1049 (D.C.2008).

**69.** See *supra* notes 6 & 66 and accompanying text.