# District of Columbia
# Court of Appeals

**No. 13-CF-1234**

EDWARD BROWN,

Appellant,



FILED
MAY 26 2016
DISTRICT OF COLUMBIA
COURT OF APPEALS

v.                                                    **CF1-6022-13**

UNITED STATES,

Appellee.

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE: BECKWITH and EASTERLY, *Associate Judges*; and NEBEKER, *Senior Judge*.

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the appellant's convictions for assault with a dangerous weapon and assault with significant bodily injury are affirmed.

For the Court:

JULIO A. CASTILLO<br>Clerk of the Court

Dated: May 26, 2016.

Opinion by Associate Judge Catharine Easterly.

Opinion concurring in the result by Senior Judge Frank Q. Nebeker.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CF-1234

EDWARD BROWN, APPELLANT,

FILED 5/26/16
District of Columbia
Court of Appeals

*Julio Castillo*
Clerk of Court

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-6022-13)

(Hon. Ronna Lee Beck, Trial Judge)

(Argued October 16, 2015                                        Decided May 26, 2016)

*Benjamin Miller*, Public Defender Service, with whom *James Klein*, *Jaclyn Frankfurt*, and *Jessica Brand*, Public Defender Service, were on the brief, for appellant.

*John Cummings*, Assistant United States Attorney, with whom *Vincent H. Cohen, Jr.*, Acting United States Attorney at the time the brief was filed, and *Elizabeth Trosman* and *Elizabeth H. Danello*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH and EASTERLY, *Associate Judges*, and NEBEKER, *Senior Judge*.

Opinion for the court by *Associate Judge* EASTERLY. Opinion concurring in the result by *Senior Judge* NEBEKER at page 19.

EASTERLY, *Associate Judge*:  This court has long recognized the common-law defense that authorizes an individual to protect or repossess personal property using nondeadly force and that correspondingly prohibits the use of deadly force for this purpose.  Deadly force is understood to include force likely to cause "serious bodily harm."  In this case, we consider whether the trial court should have, at Edward Brown's request, defined "serious bodily harm" for the jury using the same definition this court adopted for "serious bodily injury" in the context of aggravated assault.  *See Nixon v. United States*, 730 A.2d 145, 150 (D.C. 1999). We answer this question affirmatively.  Nevertheless, we determine that Mr. Brown is not entitled to reversal because, on this record, this instructional omission was harmless.  Thus we affirm Mr. Brown's convictions for assault with a dangerous weapon and assault with significant bodily injury.[1]

---

[1]  Our concurring colleague does not take issue with our discussion of how the jury should have been instructed here, but argues that this court must resolve the case solely on harmlessness grounds because of D.C. Code § 11-721 (e) (2012 Repl.) and the harmless-error rule that it codifies.  This statute and corresponding rule bar us only from overturning judgments when an error had no appreciable impact on the fairness of the trial court proceedings; they say nothing about how we must write opinions that affirm a judgment on harmlessness grounds.  Our colleague expresses concern about judicial efficiency, but, in the appropriate case, clear explication of the law promotes that goal.

## I.   Facts and Procedural History

After an incident in which Mr. Brown struck Torita Burt in the head with the blunt end of a hatchet while she was visiting him in his apartment, Mr. Brown was charged with first-degree sexual abuse while armed,[2] kidnapping while armed,[3] assault with a dangerous weapon,[4] and assault with significant bodily injury.[5]  He pled not guilty on all counts and was tried by a jury.  At trial, Mr. Brown did not dispute that he had struck Ms. Burt.  The only question was why Mr. Brown had done so.

Ms. Burt testified for the prosecution that she knew Mr. Brown well and, after meeting him on the street, had voluntarily gone to his apartment to smoke crack and have sex with him.  When she tried to leave, however, Mr. Brown hit her on the head with a hatchet and pinned her to the bed by her throat.  He agreed to let her depart only after she had sex with him again.  Ms. Burt testified that "you need a key in order to exit" Mr. Brown's apartment building, and that, after they had

---

[2]  D.C. Code §§ 22-3002 (a)(1), -4502 (2012 Repl.).

[3]  D.C. Code §§ 22-2001, -4502 (2012 Repl.).

[4]  D.C. Code § 22-402 (2012 Repl.).

[5]  D.C. Code § 22-404 (a)(2) (2012 Repl.).

sex, she had to wait for him to unlock the apartment building door to "let [her] out." Once she left the building, she walked several blocks before collapsing on the sidewalk. She then called 911, and the responding police officers found her sitting on a stoop, bleeding from a cut on the left side of her head. An ambulance took Ms. Burt to Howard University Hospital, where she received nine stitches, a sexual-assault exam, and a CAT scan that revealed a subdural hematoma.[6]

Mr. Brown told a different story. He testified that Ms. Burt, whom he had known for almost ten years, came to his apartment building around 3:00 a.m. hoping to use his bathroom. Mr. Brown let Ms. Burt in, and while she was in his apartment, she smoked crack and initiated oral sex with him. Afterward, Ms. Burt asked Mr. Brown for money to buy more cocaine, but he refused. Mr. Brown briefly left the room, and when he returned, he noticed that his new cell phone and charger, his wallet, and money from his dresser were missing. He accused Ms. Burt of taking his things, which she repeatedly denied; eventually, she picked up his hatchet, which had been on the floor nearby,[7] and started swinging it at him.

---

[6] According to Margaret Goodwin, a nurse who examined Ms. Burt, "[a] subdural hematoma is a blood collection between the outer two layers of tissue around the brain."

[7] Mr. Brown explained that he "had that hatchet for about 15 years" and "always kept it beside [his] bed."

Ms. Burt dropped the hatchet, Mr. Brown picked it up, and Ms. Burt tried to get it back from him. As they were grappling with the weapon, Mr. Brown struck Ms. Burt on the head with the hatchet's blunt end. The blow caused her to fall "on her knees" and she ended up "slumped over" on his bed, "with her head down." She lay there for "about a minute and a half to two minutes before she even raised her head up."

Mr. Brown testified that he felt "real bad after [Ms. Burt] got hit," that he had not been trying to hurt her, and that he was just trying to "protect [him]self."[8] He took her into the bathroom to clean and bandage her wound, and then walked her back to the bedroom. He went back to the bathroom to clean the sink and, "like two minutes later," when he came back to the bedroom, Ms. Burt was not there. She had already gone downstairs and was waiting by the building's front door for him to open it. He offered to call 911, but she said she was "okay." He

---

[8] As part of its case, the government played a recording of a telephone call Mr. Brown made to his girlfriend from jail. This recording was not provided to this court and the call was not transcribed. It is our understanding, however, based on the government's cross-examination of Mr. Brown and its closing, that during this call Mr. Brown explained that he had hit Ms. Burt with the hatchet because she was stealing from him.

let her out and then locked the door after her.[9]  When the police arrived at Mr.

Brown's apartment a little later, he showed them the bloody sheets and the towels

he had used to clean up after the incident.

At the close of the evidence, Mr. Brown requested an instruction on self-

defense.[10]  He also requested an instruction on defense of personal property, which

authorizes the use of reasonable, nondeadly force to repossess personal property

and correspondingly prohibits the use of deadly force for that purpose.[11]  Because

"deadly force" is defined as "force that is likely to cause death or serious bodily

---

[9] At some point prior to her departure, Ms. Burt returned Mr. Brown's personal property, but Mr. Brown did not explain when she did so.

[10] Counsel noted this request in court and then elaborated on it in an email after court proceedings had concluded for the day.  After dismissing the jury, the court had informed the parties that it would "send . . . draft instructions fairly soon after I leave the bench" and asked them "to [send] any comments you have tonight by e-mail . . . including responses to any comments made by either of you to the instructions."  To supplement the record, Mr. Brown has submitted to this court four emails sent that evening between the court and the parties, but it is unclear if these constitute the full extent of the ensuing electronic communications.

We acknowledge the convenience of email, but if matters of substance are discussed, the parties and the court must make these communications part of the record during the course of the trial.  Failure to do so risks a record remand to completely document the arguments made by the parties and the reasoning underlying the trial court's rulings.  In this case, neither party has asserted that the record is materially incomplete.

[11] Criminal Jury Instructions for the District of Columbia, No. 9.520 (B) (5th ed. 2013) (instruction on defense of personal property).

harm,"[12] Mr. Brown asked the court to define the latter term. Specifically, Mr. Brown asked the court to borrow the instruction defining "serious bodily injury" from the standard jury instruction for aggravated assault, and thus to inform the jury that the phrase "serious bodily harm," as used in the defense-of-personal-property instruction, means "an injury that involves unconsciousness, extreme physical pain, protracted and obvious disfigurement, protracted loss or impairment of the function of a bodily member, organ or mental faculty or a substantial risk of death."[13]

The trial court determined that Mr. Brown's trial testimony did not support a defense-of-property instruction, but that the call he made to his girlfriend from jail, *see supra* note 8, "does arguably, I think." Thus the court agreed to instruct the jury on defense of property. But the court refused to define "serious bodily harm" using the definition of the aggravated-assault element of "serious bodily injury." The court explained that

---

[12] *See* Criminal Jury Instructions for the District of Columbia, No. 9.501 (B) (5th ed. 2013) (instruction on self-defense).

[13] *See* Criminal Jury Instructions for the District of Columbia, No. 4.103 (5th ed. 2013) (instruction on aggravated assault).

> we're talking about a common law term that . . . we haven't defined, precisely, for juries in making decisions about self-defense and, in this case, defense of property. And that—that's very different from a legislated definition for purpose[s] of defining a crime such as aggravated assault. . . . [The legislated definition is] different than a term that's been used for long before that where we leave it to the jury to make that kind of community judgment about the use of force.

In response to Mr. Brown's concern that the jury would confuse "serious bodily harm" with "significant bodily injury" (because the latter term would be defined for the jury as part of the court's felony assault instruction[14]), the court offered to instruct the jury that "serious bodily harm" and "significant bodily injury" meant different things, but Mr. Brown declined this offer. The court ultimately instructed the jury:

> Every person has the right to use reasonable non-deadly force to protect his property from theft when he reasonably believe[s] that . . . his property is in immediate danger of an unlawful taking and that the use of such force is necessary to avoid the danger.

> Similarly, if a person reasonably believes that someone has unlawfully taken his property, he may use reasonable, non-deadly force to repossess the property.

---

[14] *See* Criminal Jury Instructions for the District of Columbia, No. 4.102 (A) (5th ed. 2013) (defining significant bodily injury as "an injury that requires hospitalization or immediate medical treatment to preserve the health and well-being of the individual").

A person may not use deadly force to protect his property from theft or to repossess his property. Deadly force is force that is likely to cause death or serious bodily harm.

Defense of property with non-deadly force is a defense to the charges of assault with a dangerous weapon and assault with significant bodily injury.

The Defendant is not required to prove that he acted in defense of his property with non-deadly force. If evidence of defense of property with non-deadly force is present, the Government must prove, beyond a reasonable doubt, that the Defendant did not act in defense of his property with non-deadly force. If the Government has failed to do so, you must find the Defendant not guilty.

After a brief period of deliberation, the jury acquitted Mr. Brown of first-degree sexual abuse while armed and kidnapping while armed, and convicted him of assault with a dangerous weapon and assault with significant bodily injury. This appeal followed.

## II.    Instructional Error

Mr. Brown argues that the trial court erred by declining to define the term "serious bodily harm." Mr. Brown argues that this term has a fixed meaning— specifically, the definition this court established in *Nixon v. United States* for the term "serious bodily injury" in the context of the instruction for aggravated assault.

He further argues that without adequate guidance as to the meaning and severity of injury signified by "serious bodily harm," the jury might have erroneously determined that he employed deadly force, negating any defense-of-personal-property defense to the assault charges against him.

While we review for abuse of discretion a trial court's assessment of whether a jury instruction is supported by the evidence, *see Wheeler v. United States*, 930 A.2d 232, 238 (D.C. 2007), we review de novo the content of the instructions actually given, *see Wilson-Bey v. United States*, 903 A.2d 818, 827 (D.C. 2006) (en banc) ("The question whether the challenged instruction was proper . . . is one of law. Accordingly, our review is *de novo*, and we accord no deference to the ruling of the trial court."). The question here is whether the trial court adequately instructed the jury regarding the scope of the defense-of-personal-property defense; we review that legal question de novo.[15]

---

[15] *See, e.g., Zeledon v. United States*, 770 A.2d 972, 977 (D.C. 2001) (finding instructional error where the court had "no reasonable assurance that the jury measured the conflicting evidence of seriousness against the [correct] standard").

In support of its argument that this court should review only for abuse of discretion in this case, the government quotes *Scott v. United States*, 954 A.2d 1037, 1045 (D.C. 2008) ("When an appellant challenges an instruction given by the trial court, [this court's] review is for abuse of discretion."). But the division in *Scott* could not overrule the en banc court in *Wilson-Bey*, *see M.A.P. v. Ryan*, 285

(continued…)

We first address Mr. Brown's argument that "serious bodily harm" has a fixed meaning synonymous with "serious bodily injury" as used in the context of aggravated assault. Left undefined by the Council, "serious bodily injury" in D.C. Code § 22-404.01 (2012 Repl.) has been given a particular meaning by this court: specifically, it requires proof of "bodily injury that involves a substantial risk of death, unconsciousness,[16] extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ or mental faculty." *Nixon*, 730 A.2d at 149-50.[17] This court borrowed that definition from another statute,[18] but only after ascertaining that this

---

(…continued)

A.2d 310, 312 (D.C. 1971), nor did it purport to try. Rather, this quote, which was part of the division's overview of the law, supports the proposition noted above: that this court reviews for abuse of discretion the trial court's determination whether the evidence at trial supports a particular instruction. Indeed, the division subsequently acknowledged that, because the appellant was challenging the content of an instruction, the division's task was "to determine whether the reinstruction given here by the trial court correctly stated the law." *Scott*, 954 A.2d at 1045. The division concluded that the reinstruction was reversible error. *Id*. at 1046-48.

[16] *But see In re D.P.*, 122 A.3d 903, 908 n.10 (D.C. 2015) (indicating that this court has yet to resolve whether any momentary loss of consciousness will support a conviction for aggravated assault).

[17] In cases following *Nixon* we have clarified that "the 'substantial risk' of which *Nixon* speaks is only a substantial risk of death, not a substantial risk of extreme pain, disfigurement, or any of the other conditions listed." *Scott*, 954 A.2d at 1046; *Medley v. United States*, 104 A.3d 115, 127 (D.C. 2014).

[18] D.C. Code § 22-4101 (7) (1996 Repl.) (defining term for sexual abuse statutes) (current version at D.C. Code § 22-3001 (7) (2013 Repl.)).

definition aligned with other jurisdictions' conceptions of the term, both in and beyond the assault context.[19] This definition is now a core component of the District's three-tiered classification system for assault crimes, under which aggravated assault is the most serious offense. *See In re D.P.*, 122 A.3d 903, 908 (D.C. 2015).

We see no reason the degree of serious bodily harm that establishes "deadly force" and in turn precludes the defense-of-personal-property defense should be quantitatively different from the degree of "serious bodily injury" that sustains a conviction for aggravated assault.[20] To the contrary, that measure of harm seems just right. We do not want individuals to defend their personal property by exercising force likely to cause either death or "serious bodily injury" as defined by *Nixon*. But it might restrict the defense too severely to say that it is never available when an individual employs force likely to result in *significant* bodily injury (the predicate quantum of injury for the District's intermediate assault

---

[19] *See Nixon*, 730 A.2d at 149-50 (surveying similar language from Texas, Minnesota, Connecticut, Alabama, and the Model Penal Code).

[20] *Cf. Fadero v. United States*, 59 A.3d 1239, 1250 (D.C. 2013) (choosing to craft a definition for the undefined term "significant bodily injury" in the felony APO statute "not out of proverbial whole cloth, but, rather, by reference to comparable definitions in other District of Columbia assault statutes").

crime[21]).  Even within this more clearly defined boundary of nondeadly force, there is still ample room for the exercise of community judgment:  although a defendant is not precluded from using force likely to cause significant bodily injury, the fact-finder must still determine that the use of nondeadly force within these limits was reasonable.[22]

The government does not argue that adopting the *Nixon* definition of "serious bodily injury" sets the bar for deadly force in the wrong place.[23]  Instead, it takes issue with this court setting the bar at all.  Following the trial court's reasoning, the government argues that this common-law defense should be left to

---

[21]  *See Teneyck v. United States*, 112 A.3d 906, 909 (D.C. 2015); *Quintanilla v. United States*, 62 A.3d 1261, 1264-65 (D.C. 2013).

[22]  This "reasonableness" requirement ensures the proportionality at the heart of this defense and others.  *See* WAYNE R. LAFAVE, 2 SUBSTANTIVE CRIMINAL LAW § 10.6 (a) (2d ed. 2015) ("[A defendant] may not use more than reasonable force—the amount of force that reasonably appears necessary to prevent the threatened interference with the property."); *see also id*. at § 9.1 (a)(3) ("[J]ustification defenses all have the same internal structure:  triggering conditions permit a necessary and proportional response. . . .  [T]he proportionality requirement . . . places a limit on the maximum harm that may be used in protection or furtherance of an interest.").

[23]  Indeed, the government does not contend that there is any meaningful difference between "harm" and "injury" in this context.  The trial court also apparently ascribed no definitional difference to these words and used them interchangeably.

the jury's "commonsense" understanding.[24] It is true that, in this jurisdiction, the defense-of-property defense is a product of common law, *see Saidi v. United States*, 110 A.3d 606, 611 (D.C. 2015); *Gatlin v. United States*, 833 A.2d 995, 1008-09 (D.C. 2003)—that is to say, it is judge-made law, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "common law" as "[t]he body of law derived from judicial decisions"). But this court has never said that the proper application of the defense is left entirely to the jury's unfettered discretion. To the contrary, we have defined the scope of this defense to make clear that, before the jury can assess the reasonableness of the force employed, it must determine as a threshold matter whether disqualifying deadly force was used. Given that this court has already defined "deadly force" to encompass force likely to cause "serious bodily harm," *McPhaul v. United States*, 452 A.2d 371, 373 n.1 (D.C. 1982); *see also United States v. Peterson*, 483 F.2d 1222, 1229 n.40 (D.C. Cir. 1973), *cert. denied*, 414 U.S. 1007 (1973), we see no reason not to further clarify that "serious bodily harm" in the context of this common-law defense shares the definition that this court set in *Nixon* for "serious bodily injury."

---

[24] The government notes that the trial court was mistaken "[i]n one regard": its reasoning that it was inappropriate to borrow the definition of "serious bodily injury" from aggravated assault because that term had been legislatively defined. The government acknowledges that this court, not the legislature, supplied the definition for this term of art.

Having determined that "serious bodily harm" in this context is synonymous with "serious bodily injury" under *Nixon*, we conclude that the trial court should have granted Mr. Brown's request to instruct the jury on that meaning. This instruction would have helped the jury locate the line between impermissible deadly force and permissible nondeadly force.[25] *See Perry v. United States*, 422 F.2d 697, 699-700 (D.C. Cir. 1969) (reversing conviction where the "jury was left to unguided speculation" because "no part of the [self-defense] instruction illumined the boundaries of reasonable, as opposed to unreasonable, resistance").[26] Without this definition, the trial court's defense-of-personal-property instruction,

---

[25] Moreover, although the court instructed the jury that defense of personal property was a defense to felony assault, this did not completely eliminate the danger that the jury might fail to appreciate that the significant bodily injury necessary to sustain felony assault was distinct from the deadly force likely to cause death or "serious bodily harm" that precludes a defendant from prevailing on a defense-of-personal-property defense.

[26] The government argues that this court's decision in *Savage-El v. United States*, 902 A.2d 120 (D.C. 2006), "makes clear [that] the trial court was not required to define a term that was not an element of the offense, but was just part of the definition of 'non-deadly force.'" We disagree. *Savage-El* did not endorse such a formalistic approach to jury instructions; rather, consistent with our other cases it examined the instructions as a whole to determine whether the jury received adequate guidance regarding the operative law and the government's burden of proof. To the extent that the court distinguished between elements and definitional terms, it did so to support its determination "that there was no meaningful risk of [jury] confusion or misunderstanding . . . in the context of the factual circumstances here" and thus no instructional error. *Id.* at 126, 127 & n.8 (acknowledging that in another case the same terms might require further instruction to give the jury adequate guidance).

taken as a whole, failed to give the jury adequate guidance to the boundaries of this defense.

## III.    Harmless Error

Although we conclude that the trial court's instruction to the jury was deficient, this error was harmless.  The parties agree that instructional error is subject to harmless error analysis.[27]  But they disagree as to which harmless error standard applies.  We need not resolve their dispute.[28]  Even if we assume that more rigorous harmless error review under *Chapman* is required, we conclude that the instructional error in this case was harmless beyond a reasonable doubt.

[27]  *Brooks v. United States*, 599 A.2d 1094, 1101-02 (D.C. 1991) (observing that this proposition is "well settled"); *accord White v. United States*, 613 A.2d 869, 877 (D.C. 1992) (en banc).

[28]  Our case law arguably does not resolve whether this error was constitutional (triggering review under *Chapman v. California*, 386 U.S. 18, 24 (1967), to determine if the error was harmless beyond a reasonable doubt) or non-constitutional (triggering review under *Kotteakos v. United States*, 328 U.S. 750, 765 (1946), to determine if we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error").  *Compare Wilson-Bey v. United States*, 903 A.2d 818, 843-44 (D.C. 2006) (en banc) (applying *Chapman* where court failed to instruct on an element), *and Neder v. United States*, 527 U.S. 1, 10, 12 (1999) (characterizing misdescription of an element as a Sixth Amendment violation), *with Jenkins v. United States*, 877 A.2d 1062, 1068-70 (D.C. 2005) (applying *Kotteakos* where court's erroneous definition of a term "impermissibly broadened" the meaning of an element).

At the outset, we note that defense of personal property was not the defense theory Mr. Brown pressed at trial.  While Mr. Brown testified that Ms. Burt took his cell phone, phone charger, wallet, and cash, and that their physical altercation was prompted by his accusations of theft, he claimed he hit Ms. Burt in the head with a hatchet only after she tried to use the hatchet against him.  Although at one point Mr. Brown said he hit her after he "just got tired of playing with her because I wanted my things back," he later elaborated that he "was terrified" when she picked up the hatchet, and that she "end[ed] up getting hit" after he had recovered the weapon, when she was trying to take it back from him.  He expressly affirmed that when Ms. Burt "g[o]t hit with the hatchet" he was "trying to protect [him]self."

Nevertheless, the trial judge determined that Mr. Brown was entitled to an instruction on defense of personal property.[29]  But even after the court gave the

---

[29] In deciding to give the instruction, the court relied on the recording of the call Mr. Brown made from jail to his girlfriend in which he apparently stated that he hit Ms. Burt because she stole his property.  *See supra* note 8.  The government argues that this evidence did not support the court's ruling, but instruction on defense of personal property is justified so long as "some evidence" has been presented on the subject.  *See Anderson v. United States*, 490 A.2d 1127, 1129 (D.C. 1985).  Given what we can infer about the content of the phone call, we cannot say that the trial court abused its discretion by instructing the jury on this defense.  *See Wheeler*, 930 A.2d at 238.

jury this instruction, counsel for Mr. Brown made no reference to this defense theory in closing. Defense counsel instead argued that Mr. Brown was "defending himself."

Even if we assume that the jury, without encouragement from Mr. Brown, gave serious consideration to a defense-of-personal-property theory, we are convinced that the jury's understanding of "serious bodily harm" could not have affected the jury's evaluation of this defense, and that the jury's guilty verdict is "surely unattributable" to the trial court's instructional error.[30] Whether or not the jury accurately assessed whether Mr. Brown employed nondeadly force, no jury could find that the force used in this case was reasonable.

The defense-of-personal-property defense permits a person to use only as much nondeadly force as is "reasonably necessary" to protect or recover his belongings. *See supra* note 22. In other words, even if a defendant uses nondeadly force, he nonetheless exceeds the boundaries of the defense if that nondeadly force is "more force than is necessary." *Gatlin*, 833 A.2d at 1008, 1010-11 (quoting *Shehyn v. United States*, 256 A.2d 404, 406 (D.C. 1969)); *see also Saidi*, 110 A.3d

---

[30] *See Neder*, 527 U.S. at 38 (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993)); *see also Fields*, 952 A.2d at 863.

at 611; LaFave, *supra* note 22.  For example, in *Gatlin*, we rejected the defense after concluding, *inter alia*, that it was not reasonable to grab and punch a person's arms in order to retrieve a notebook.  833 A.2d at 1010.

It was undisputed at trial that Ms. Burt was unarmed and locked in Mr. Brown's apartment building.  Thus, she could not have fled with Mr. Brown's property.  Assuming it was reasonable for Mr. Brown to use some force to retrieve his belongings from Ms. Burt under these circumstances, it was surely unreasonable for him to strike Ms. Burt in the head with enough force to knock her down, cause internal bleeding in her brain, and create an external wound requiring nine stitches to repair.

Accordingly, we affirm Mr. Brown's convictions for assault with a dangerous weapon and assault with significant bodily injury.

*So ordered*.

NEBEKER, *Senior Judge*, concurring:  As the Supreme Court of Washington State aptly said in 1976, as a general rule, "this court will decide only such questions as are necessary for a determination of the case presented for

consideration, and will not render decisions in advance of such necessity." *Johnson v. Morris*, 87 Wash. 2d 922, 930-31 (1976). Thus I am prompted to concur in the result, and offer a review of the harmless error rule, its purpose and application to the case before us.

Section 11-721 (e) of the D.C. Code is "a codification of the harmless error rule," *Brown v. United States*, 379 A.2d 708, 710 (D.C. 1997), and provides:

> On the hearing of any appeal in any case, the District of Columbia Court of Appeals shall give judgment after an examination of the record without *regard* to errors or defects which do not affect the substantial rights of the parties. (Emphasis added.)

All fifty states have codified the harmless error rule and Congress first codified the rule in 1919, "establish[ing] for [the federal] courts the rule that judgments shall not be reversed for 'errors or defects which do not affect the substantial rights of the parties.'" *Chapman v. California*, 386 U.S. 18, 22 (1967); *Kotteakos v. United States*, 328 U.S. 750, 758-59 (1946). Prior to 1919, in applying the common-law harmless-error rule, there was a "practice in some jurisdictions of reversing convictions on appeal for any procedural error at trial, without *regard* to whether the error was prejudicial." *United States v. Lane*, 474 U.S. 438, 457 (1986) (emphasis added). The result of this practice was to make

"[s]o great the threat of reversal" that a "criminal trial became a game for showing reversible error in the record." *Kotteakos*, *supra*, 328 U.S. at 760. In response to criticism from several leaders in the legal profession, including Taft, Wigmore, Pound, and Hadley, Congress passed the 1919 Act, explaining that the purpose was to ensure that considerations of error "be rendered upon the merits without permitting reversals for technical defects in the procedure below." *United States v. Lane*, *supra*, 474 U.S. at 457-58 (quoting H.R.Rep. No. 913, 65th Cong., 3d Sess., 2 (1919)).

So valuable is this rule in maintaining judicial efficiency that our legislation provides our court no discretion in determining whether to reverse in the face of a harmless error. By employing the word "shall," the statute makes clear that adherence "is required." BLACK'S LAW DICTIONARY 1585 (10th ed. 2014). *See also Randolph v. United States*, 882 A.2d 210, 221 (D.C. 2005) (characterizing § 11-721 (e) as a "command"); *Arnold v. United States*, 358 A.2d 335, 341 (D.C. 1976) (same). We therefore *shall* "give judgment . . . without regard to errors." The word "regard" in this respect means "[a]ttention, care, or consideration." BLACK'S LAW DICTIONARY, *supra*, 1472. It is clear from the language of § 11-721 (e), that the purpose of the harmless error rule was not only to prevent frequent

reversals on technicalities, but also to promote judicial efficiency.  *See also* D.C. Super. Ct. R. Crim. P. 52 (a).

Some might argue that error must be identified before we disregard it.  To do so would be contrary to the purpose of the rule — judicial efficiency.  An assumption of error, without deciding it for posterity, will do.  In the case before us, the majority takes great lengths to decide an issue that we are commanded, by the harmless error rule, to disregard.  The last part of this opinion most aptly makes the case for harmlessness, and I concur in that portion of it only, not because I necessarily disagree with the first part, but because it engages in an unnecessary extrapolation, counter to the very purpose of the harmless error rule, which in time compromises the efficiency in opinion writing.